PUBLIC VERSION

# UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE HONORABLE CLAIRE R. KELLY

| | |
|---|---|
| GULF ALUMINIUM ROLLING MILL B.S.C. (C),<br><br>     Plaintiff,<br><br> v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br> and<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS,<br><br>     Defendant-Intervenors. | Ct. No. 26-02359<br><br><br>**PUBLIC VERSION**<br><br>**Business Proprietary Information Removed from Brackets ("[ ]") on pp. 13-20 and 22-25** |

## PLAINTIFF'S RULE 56.2 MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Christine M. Streatfeild
Nathaniel J. Halvorson
Jasmine Elmasry

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff Gulf Aluminium
Rolling Mill B.S.C. (C)*

August 4, 2026

## TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT ...................................................................................1

A.  Administrative Determination to Be Reviewed ...........................................1

B.  Issues Presented and Summary of Argument...............................................1

II.   STATEMENT OF FACTS ................................................................................4

III.  STANDARD OF REVIEW................................................................................8

IV.   ARGUMENT......................................................................................................12

A.  Commerce's Selection of the UAE as the Third-Country
    Export Market Is Unsupported by Substantial Evidence
    and Not in Accordance with Law................................................................12

B.  Commerce Erred in its Application of the Major Input
    Rule .............................................................................................................20

C.  Commerce's Selection of the Earlier of the Shipment
    Date or Invoice Date as the Date of Sale Is Unsupported
    by Substantial Evidence and Not in Accordance with Law ....................26

V.    CONCLUSION ................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
   167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) ..................................................9

*ArcelorMittal USA LLC v. United States*,
   302 F.Supp.3d 1366, 1370 (Ct. Int'l Trade 2018) ..................................................12

*Atlantic Sugar, Ltd. v. United States*,
   744 F.2d 1556, 1562 (Fed. Cir. 1984) .....................................................................9

*British Steel PLC v. United States*,
   127 F.3d 1471, 1475 (Fed. Cir. 1997) ....................................................................19

*Chemours Company FC, LLC v. United States*,
   443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) ..................................................9

*Ellwood City Forge Co. v. United States*,
   Court No. 23-00191, Slip Op. 26-44  (Ct. Int'l Trade Apr. 28, 2026) .................22

*Giorgio Foods, Inc. v. United States*,
   Court No. 23-00133, Slip Op. 24-79 (Ct. Int'l Trade July 17, 2024) ..................13

*Husteel Co. v. United States*,
   491 F. Supp. 2d 1283, 1295 (Ct. Int'l Trade 2007) ...................................... 14, 18

*In re NuVasive, Inc.*,
   842 F.3d 1376, 1382 (Fed. Cir. 2016) .....................................................................9

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373, 1379 (Fed. Cir. 2003) .....................................................................9

*NMB Sing. Ltd v. United States*,
   557 F.3d 1316, 1319 (Ct. Int'l Trade 2009)...........................................................18

*Nucor Corp. v. United States*,
   612 F. Supp. 2d 1264, 1303 (Ct. Int'l Trade 2009) ............................... 12, 26, 27

*Sahaviriya Steel Industries Public Co. Ltd. v. United States*,
    714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010) ...............................................26

*SeAH Steel Corp. v. United States*,
    704 F. Supp. 2d 1353, 1377 (Ct. Int'l Trade 2010) ...............................................11

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474, 487 (1951) ........................................................................................9

*USEC Inc. v. United States*,
    498 F. Supp. 2d 1337, 1343 (Ct. Int'l Trade 2007) ...............................................26

**Statutes**

19 U.S.C. § 1677b(a)(1)(A) ............................................................................................11

19 U.S.C. § 1677b(a)(1)(B)(ii) .......................................................................................13

19 U.S.C. § 1677b(a)(1)(B)(ii)(I)-(III) ...........................................................................10

19 U.S.C. § 1677b(a)(1)(C) .............................................................................................10

19 U.S.C. § 1677b(f)(2) ........................................................................................... 21, 24

19 U.S.C. § 1677b(f)(3) ............................................................................... 11, 20, 21, 24

**Regulations**

19 C.F.R. § 351.401(i) .............................................................................. 12, 25, 26, 28

19 C.F.R. § 351.404(e) ............................................................................................ 10, 13, 18

19 C.F.R. § 351.407 .........................................................................................................20

19 C.F.R. § 351.407(b) ............................................................................................. 11, 20

19 C.F.R. § 351.407(b)(2) ...............................................................................................24

## Rule

*Antidumping Duties; Countervailing Duties: Final Rule*,
   62 Fed. Reg. 27,296, 27,349 (Dep't of Commerce May 19, 1997).......................27

## Other Authorities

*Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany,
   India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain,
   Taiwan and the Republic of Turkey: Antidumping Duty Orders*,
   86 Fed. Reg. 22,139 (Dep't of Commerce Apr. 27, 2021) .....................................4

*Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Results of
   Antidumping Duty Administrative Review; 2023-2024,*
   91 Fed. Reg. 7,250 (Dep't of Commerce Feb. 17, 2026) ......................................1

*Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Preliminary Results
   of Antidumping Duty Administrative Review; 2023-2024*,
   90 Fed. Reg. 37,840 (Dep't of Commerce Aug. 8, 2025).......................................7

*Common Alloy Aluminum Sheet From the Kingdom of Bahrain: Preliminary
   Results of Antidumping Duty Administrative Review; 2024-2025*,
   91 Fed. Reg. 42,928, 42,928 (Dep't of Commerce July 13, 2026).......................19

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   89 Fed. Reg. 49,844 (Dep't of Commerce Jun. 12, 2024).....................................5

## I.    RULE 56.2 STATEMENT

### A. Administrative Determination to Be Reviewed

Plaintiff Gulf Aluminium Rolling Mill B.S.C. (C) ("GARMCO") seeks judicial review of the final results issued by the U.S. Department of Commerce ("Commerce") in the antidumping duty ("AD") administrative review of common alloy aluminum sheet ("CAAS") from the Kingdom of Bahrain (Case No. A-525-001).  The period of review ("POR") was April 1, 2023, through March 31, 2024. Notice of the final results was published in the *Federal Register* on February 17, 2026.  *See Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Results of Antidumping Duty Administrative Review; 2023-2024,* 91 Fed. Reg. 7,250 (Dep't of Commerce, Feb. 17, 2026) ("Final Results"), P.R.11, and accompanying *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Common Alloy Aluminum Sheet from the Kingdom of Bahrain; 2023-202*4 (Feb. 10, 2026) ("Final IDM"), P.R.12; *see also* Memorandum entitled *Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Analysis Memorandum* (Feb. 10, 2026) ("Final Analysis Memo"), P.R.10/C.R.4.

### B. Issues Presented and Summary of Argument

This appeal presents three independent errors in Commerce's final results. In each instance, Commerce departed from the governing statute, regulations, and record evidence in ways that materially distorted the dumping calculation.  First,

1

Commerce selected the United Arab Emirates ("UAE") rather than Saudi Arabia as the third-country comparison market even though Saudi Arabia was the largest viable market and provided the more representative sales universe for comparison to GARMCO's U.S. sales.  Second, Commerce applied the major input rule without making the statutory predicate finding that the affiliated input prices were below the supplier's cost of production, and instead conflated the major input rule with the transactions disregarded rule.  This conflicts with Commerce's administrative decisions in other review periods where the same underlying facts existed.  Third, Commerce used the earlier of shipment date or invoice date as the date of sale despite record evidence showing that the parties established the material terms of sale on the contract date.  Because each determination is unsupported by substantial evidence and otherwise not in accordance with law, the Court should remand Commerce's final results.

> **1. Whether Commerce's selection of the UAE, rather than Saudi Arabia, as the third-country comparison market when sales volume were lower and representative sales were less robust was lawful and supported by substantial evidence?**

No.  Commerce's selection of the UAE did not comport with the statute and regulations, which require a representative third-country comparison market.  Commerce's own practice favors the largest viable market when the relevant factors are otherwise equal.  Here, Saudi Arabia was the largest third-country market, contained far greater sales volume and sales quantity matching the alloy

2

**PUBLIC VERSION**

types sold to the United States, and provided a more robust comparison universe.

Commerce nevertheless elevated a marginal additional alloy type in the UAE – one

accounting for only a negligible share of U.S. sales – over the substantially larger

and more representative Saudi Arabian market.  Commerce failed to adequately

explain that departure from the record and practice, and its selection of the UAE

should be remanded.

> **2. Did Commerce properly apply the major input rule even though it did not first find a reasonable belief that an affiliated-party input price was below the supplier's cost of production?**

No.  Commerce did not lawfully apply the major input rule.  The statute

authorizes Commerce to invoke that rule only where it has reasonable grounds to

believe or suspect that an affiliated-party input price is below the supplier's cost of

production.  Commerce made no such finding.  Instead, Commerce relied on a

comparison between affiliated and unaffiliated sales prices, effectively applying

the transactions disregarded rule while citing the major input rule as authority.

That conflation bypassed the statutory prerequisite for a major input adjustment

and rendered Commerce's adjustment unsupported by substantial evidence and

contrary to law.

**3. Did Commerce lawfully select the earlier of shipment date or invoice date as the date of sale despite record evidence that the material terms of sale were established on the contract date?**

No.  Commerce's date-of-sale determination was unsupported by substantial evidence and not in accordance with law.  Under 19 C.F.R. § 351.401(i), Commerce must use the date on which the parties establish the material terms of sale.  The record showed that GARMCO and its customers established those terms on the contract date.  Commerce nevertheless applied the earlier of shipment date or invoice date without conducting the required fact-intensive analysis of when the parties reached a meeting of the minds.  Because the record demonstrated that the material terms were fixed at contract, Commerce's contrary determination should be remanded.

## II.    STATEMENT OF FACTS

On April 27, 2021, Commerce issued the AD order on Common Alloy Aluminum Sheet from Bahrain.  *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22,139 (Dep't of Commerce, April 27, 2021).

On June 12, 2024, Commerce initiated the administrative review of the AD order on CAAS from the Kingdom of Bahrain for the 2023-2024 POR.  *See*

4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 49,844 (Dep't of Commerce Jun. 12, 2024), P.R.123.  GARMCO was the only respondent subject to the review and therefore was selected as the sole mandatory respondent.

From July 2024 to June 2025, Plaintiff provided timely responses to Commerce's initial and supplemental questionnaires.  *See Letter from Baker & McKenzie LLP to the Hon. Gina A. Raimondo, GARMCO's Section A Response*, Case No. A-525-001 (Jul. 22, 2024) ("GARMCO's AQR"), P.R.110/C.R.103-125; *Letter from Baker & McKenzie LLP to the Hon. Gina A. Raimondo, GARMCO's Sections B & C Response*, Case No. A-525-001 (Aug. 19, 2024) ("GARMCO's BCQR"), P.R.87/C.R.100; *Letter from Baker & McKenzie LLP to the Hon. Gina A. Raimondo, GARMCO's Section D Response*, Case No. A-525-001 (Sept. 3, 2024) ("GARMCO's DQR"), P.R.83/C.R.93-94; *Letter from Baker & McKenzie LLP to the Hon. Gina A. Raimondo, GARMCO's First Supplemental Questionnaire Response*, Case No. A-525-001 (Sept. 25, 2024) ("GARMCO's SQR1"), P.R.79/C.R.85; *Letter from Baker & McKenzie LLP to the Hon. Gina A. Raimondo, GARMCO's Section B Response (UAE)*, Case No. A-525-001 (Nov. 15, 2024) ("GARMCO's BQR (UAE)"), P.R.74/C.R.82; *Letter from Baker & McKenzie LLP to the Hon. Jeremy Pelter, GARMCO's Second Supplemental Questionnaire Response*, Case No. A-525-001 (Feb. 11, 2025) ("GARMCO's

5

SQR2"), P.R.62/C.R.74; *Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, GARMCO's Third Supplemental Questionnaire Response*, Case No. A-525-001 (Apr. 24, 2025) ("GARMCO's SQR3"), P.R.54/C.R.37-39; *Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, GARMCO's Fourth and Fifth Supplemental Questionnaire Response*, Case No. A-525-001 (Jun. 18, 2025) ("GARMCO's SQR4/5"), P.R.44/C.R.25-31; *Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, GARMCO's Sixth Supplemental Questionnaire Response*, Case No. A-525-001 (Jul. 15, 2025) ("GARMCO's SQR6"), P.R.39/C.R.17.

In its responses, Plaintiff explained and thoroughly demonstrated why Saudi Arabia was the most suitable comparison country. *See* GARMCO's AQR at 4, Exhibit A-1, P.R.110/C.R. 103-125; GARMCO's BCQR at B-8 – B-9, P.R.87/C.R.100; GARMCO's SQR1 at Exhibit SA-1, P.R.79/C.R.85; GARMCO's BQR (UAE) at 1-2, Exhibit A2-1, P.R.74/C.R.82; GARMCO's SQR4/5 at 2, P.R.44/C.R.25-31. Despite this information, Commerce selected the UAE as the third-country comparison market. *See Memorandum to Alex Villaneuva, Senior Director, Office I, Antidumping and Countervailing Duty Operations From Christopher Williams, International Trade Compliance Analyst, Office I, Antidumping and Countervailing Duty Operations, Selection of an Appropriate*

6

*Third Country Market*, Case No. A-525-001 (Oct. 16, 2024) ("3rd Country

Memo").

On August 8, 2025, Commerce issued its Preliminary Results.  *See Common*

*Alloy Aluminum Sheet from the Kingdom of Bahrain: Preliminary Results of*

*Antidumping Duty Administrative Review; 2023-2024*, 90 Fed. Reg. 37,840 (Dep't

of Commerce Aug. 8, 2025) ("Preliminary Results"), P.R.34, and accompanying

*Decision Memorandum for Preliminary Results of Antidumping Duty*

*Administrative Review of Common Alloy Aluminum Sheet from the Kingdom of*

*Bahrain; 2023-2024* (Aug. 1, 2025) ("PDM"), P.R. 35, as well as the

Memorandum entitled *Common Alloy Aluminum Sheet from the Kingdom of*

*Bahrain: Preliminary Analysis Memorandum* (Aug. 1, 2025) ("Prelim Analysis

Memo"), P.R.30/C.R.12.  In its Preliminary Results, Commerce used the UAE as

the third-country comparison market, applied the major input rule to Plaintiff's

purchases of certain inputs from its supplier thereby significantly adjusting its

reported cost of production, and ignored record evidence that should have

informed its date of sale analysis – namely, that established GARMCO's contract

date sets the material terms of sale.

On September 3, 2025, Plaintiff submitted its administrative case brief, in

which Plaintiff argued that Commerce, *inter alia*: (i) should select Saudi Arabia as

the third-country comparison market based on the clear record evidence

7

**PUBLIC VERSION**

establishing Saudi Arabia as the largest third-country market and thus the proper comparison market; (ii) erred in its application of the major input rule; and (iii) should rely on the contract date, on which the material terms of the transaction were set, as the date of sale. *See generally Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, 2023-2024 Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet: GARMCO's Case Brief*, Case No. A-525-001 (Sept. 3, 2025), P.R.23/C.R.7.

On February 17, 2026, Commerce published its Final Results, along with the related Final IDM and Final Analysis Memo. Commerce expressly determined that Saudi Arabia was the largest market, yet nevertheless selected the UAE because it had the largest number of "unique products matching GARMCO's sales to the United States during the POR." *See* Final IDM at 5, P.R.12. Further, Commerce did not meaningfully engage with GARMCO's arguments regarding the application of the major input adjustment, and found that material terms of the sale had been changed after the contract date, and therefore, that the earlier of the shipment date or invoice date applied. *Id*. at 7-9, P.R.12.

## III.    STANDARD OF REVIEW

This Court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

8

To satisfy the "substantial evidence" standard, Commerce must take into account "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). And the Court may not sustain Commerce's determination "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

In order to satisfy the "substantial evidence" standard, Commerce must also provide a reasoned explanation for its determination. To do so, it must "make the necessary findings and have an adequate evidentiary basis for its findings," which requires "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)). Commerce "must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

To be "in accordance with law," Commerce's determination must comply with the antidumping duty statute and its implementing regulations. In

9

antidumping duty investigations, the accuracy of Commerce's dumping margin calculations depends on its proper identification of the date of sale for a respondent's U.S. sales and home market (or in this case, third-country export market) sales.

Commerce may base normal value on third-country market prices when it determines that the aggregate quantity (or if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison to U.S. sales. *See* 19 U.S.C. § 1677b(a)(1)(C). When the home market is not viable, Commerce bases normal value on prices in a third country market if: (1) prices in that market are representative; (2) the aggregate quantity (or, if quantity is not appropriate, value) of sales in the third country market is five percent or more of the aggregate quantity (or value) of U.S. sales; and, (3) no "particular market situation" exists that would prevent appropriate comparisons with U.S. prices. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(I)-(III). Where prices in more than one third-country market satisfy the requirements of the statute, Commerce will generally select the third-country market based on the following criteria: (1) whether the foreign like product exported to a particular third-country market is more similar to the subject merchandise exported to the United States than the foreign like product exported to other third countries; (2) whether the volume of sales to a particular third-country market is larger than the volume of

10

sales to other third countries; and (3) other factors that Commerce considers appropriate. *See* 19 C.F.R. § 351.404(e). Commerce's practice "if all other factors are equal," is "to select the largest third-country market by volume." *See* 3rd Country Memo at 3, P.R.77/C.R.83.

The "major input rule" directs that if (1) a transaction between affiliated companies involves the production by one such company of a "major input" to the merchandise produced by the other, and (2) Commerce has "reasonable grounds to believe or suspect" that the amount reported as the value of such input is below the cost of production, then Commerce may calculate "the value of the major input on the basis of the information available regarding such cost of production," if such cost exceeds the market value of the input as determined under § 1677b(f)(2). *See* 19 U.S.C. § 1677b(f)(3); *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1377 (Ct. Int'l Trade 2010). One of the mechanisms by which Commerce has chosen to administer 19 U.S.C. §§ 1677b(f)(2)-(3) is 19 C.F.R. § 351.407(b), which provides that Commerce will value a major input supplied by an affiliated party based on the highest of (1) the actual transfer price for the input; (2) the market value of the input; or (3) the cost of production of the input.

Commerce uses the date of sale to determine the universe of U.S. sales that occurred during the POR; to perform accurate foreign currency conversions where necessary; and to ensure appropriate comparisons between the U.S. export price (or

11

constructed export price) and the normal value. *See* 19 U.S.C. § 1677b(a)(1)(A)

(defining the "normal value" as "the price {of the foreign like product} at a time

reasonably corresponding to the time of the sale used to determine the export price

or constructed export price."); *see also ArcelorMittal USA LLC v. United States*,

302 F.Supp.3d 1366, 1370 ("The date of sale therefore defines the universe of sales

that fall within Commerce's {POI}, and that are subject to Commerce's less than

fair value determination."). Under 19 C.F.R. § 351.401(i), Commerce must use

"the date on which the exporter or producer establishes the material terms of sale"

as the date of sale. This is a factual inquiry that Commerce must conduct

considering all record evidence. *See Nucor Corp. v. United States*, 612 F. Supp. 2d

1264, 1314 (Ct. Int'l Trade 2009) ("any evaluation of the record evidence

supporting Commerce's conclusion on date of sale must necessarily 'take into

account whatever in the record fairly detracts from {the} weight of that evidence,'

including 'contradictory evidence or evidence from which conflicting inferences

could be drawn.'").

## IV. ARGUMENT

### A. Commerce's Selection of the UAE as the Third-Country Export Market Is Unsupported by Substantial Evidence and Not in Accordance with Law

Commerce's selection of the UAE as the third-country comparison market

cannot be sustained because it unlawfully rests on the conclusion of product

similarity when all other record evidence detracted from Saudi Arabia. Commerce acknowledged that Saudi Arabia was the largest viable third-country market, and the record showed that Saudi Arabia provided substantially greater sales volume, substantially more matching sales, and a stronger overall basis for comparison to GARMCO's U.S. sales. Commerce nevertheless selected the UAE based on **[**

**]** that represented only a negligible share of U.S. sales. This determination was unlawful on its face, but moreover, Commerce failed to explain why that marginal difference outweighed Saudi Arabia's far larger and more representative sales universe. This lack of explanation is another grounds for remand and confirms that the determination is unsupported by substantial evidence, inconsistent with Commerce's regulatory obligation to select a representative comparison market, and otherwise not in accordance with law.

As a preliminary matter, the home market was not viable and so GARMCO provided third-country sales information (*i.e.*, for Saudi Arabia, the UAE, Poland, and Australia) that all met the requirements set forth in 19 U.S.C. § 1677b(a)(1)(B) subparagraph (ii). *See* 3rd Country Memo at 3, P.R.77/C.R.83.

Where multiple third countries satisfy the statutory requirements for selection as the comparison market, the statute does not direct *which* one must be selected. *See, e.g.*, *Giorgio Foods, Inc. v. United States*, Court No. 23-00133, Slip Op. 24-79 (Ct. Int'l Trade July 17, 2024), *3. In balancing the criteria set forth in

13

19 C.F.R. § 351.404(e), this Court has upheld Commerce's past decisions to select a third country where it found that substantially greater sales volumes outweighed marginal differences in product similarity. *Id*. at *17. This Court noted that "{i}f there are multiple third-country markets with eligible prices, Commerce selects as the comparison market the country with the highest volume of sales of subject merchandise that is most similar to that sold in the United States." *Husteel Co. v. United States*, 491 F. Supp. 2d 1283, 1295 (Ct. Int'l Trade 2007). A third-country market is meant to be representative of the sales of subject merchandise in the United States.

There is no dispute that Commerce had a complete and thorough record to support Saudi Arabia as the third country. Plaintiff submitted sales volumes and number of sales transactions by alloy type for the U.S. market and each third-country market. *See* AQR at Exhibit A-1, P.R.110/C.R. 103-125. Plaintiff presented clear evidence that Saudi Arabia was the largest third-country market, accounting for **[    ]** percent of GARMCO's U.S. sales volume during the POR, compared to only **[    ]** percent for the UAE and **[    ]** percent for Poland. *See Letter from Baker & McKenzie LLP to the Hon. Gina Raimondo, GARMCO's Revised Exhibit SA-1 Removing Certain BPI Designations*, Case No. A-525-001 (Oct. 9, 2024) ("Revised Exhibit SA-1"), P.R.78/C.R.84; GARMCO's BQR (UAE) at Exhibit A2-1, P.R.74/C.R.82. Further, Saudi Arabia had a total of **[        ]**

14

sales as compared to [          ] total sales in the United States, while the next

largest market, the UAE, had only [       ] total sales.  *Id*.  This demonstrated a

lack of representativeness for UAE by transactions as well as total volume.  Saudi

Arabia also overlapped with [           ] alloy types sold in the United States,

confirming the robustness of the data set of sales for Saudi Arabia.  *Id*.

Despite the overwhelming evidence in favor of Saudi Arabia as the third

country market, Commerce determined that "{a}lthough, Saudi Arabia is the

largest market… the UAE has the greatest percentage of number of sales with

similarity to GARMCO's U.S. sales and the largest number of unique products that

are identical matches to products sold by GARMCO to the United States during the

POR."  Final IDM at 5.

To determine that alloy types exported to the UAE were more similar to the

alloy types exported to the United States than the alloy types exported to Saudi

Arabia, Commerce considered GARMCO's "sales to the UAE, [       ] sales

transactions, or [     ] percent of sales," compared to "Saudi Arabia, [       ]

sales transactions, or [    ] percent of sales, have a matching alloy to U.S sales."

*See* 3rd Country Memo at 4, P.R.77/C.R.83.  These percentages of sales, however,

describe the number of sales for each alloy type sold in the United States common

to the third country as a proportion of the third country's total sales of all alloy

types (*i.e.*, [            ] for the UAE, and [            ] for Saudi Arabia).

15

These percentages do not accurately reflect, under 19 C.F.R. § 351.404(e)(1), whether the alloy types exported to the UAE are more similar to the alloy types exported to the United States than the alloy types exported to Saudi Arabia. These percentages merely show the proportion of alloy types sold to the third country (that match the alloy types sold to the U.S.) with respect to their own total sales, which is easily inflated by their number of sales or lack of sales.

A review of the data on the record, on the other hand, shows that sales to Saudi Arabia of the same alloy types sold to the United States account for a larger number of U.S. sales than the UAE. *See* Revised Exhibit SA-1; GARMCO's BQR (UAE) at Exhibit A2-1, P.R.78;74/C.R.84;82. There were a total of [          ] individual sales made of all alloy types to the United States and [          ] to Saudi Arabia, but only [          ] to the UAE; of these totals, [          ] sales to the UAE matched the same alloy types sold to the United States, whereas [          ] sales to Saudi Arabia matched the same alloy types sold to the United States. *Id.* By total weight, over [          ] kgs were sold to the United States and [          ] kgs sold to Saudi Arabia, while only [          ] were sold to the UAE; of these totals, [          ] kgs sold to the UAE matched the same alloy types sold to the United States, whereas [          ] kgs sold to Saudi Arabia matched the same alloy types sold to the United States. *Id.* Clearly, the UAE did not have the

16

"largest number of unique products" matching GARMCO's sales to the United

States as claimed by Commerce.  Final IDM at 5, P.R.12.

Commerce concluded, under 19 C.F.R. § 351.404(e)(1), that the "UAE has

the largest number of unique products matching GARMCO's sales to the United

States during the POR, serving as the better comparison market" without citing any

supporting evidence.  *See* Final IDM at 5.  In support of its continued selection of

the UAE, Commerce merely cites to the 3rd Country Memo.  *See* Final IDM at 5

n.20.  Commerce found that the UAE had the largest number of unique products

matching products sold to the United States during the POR because [            ]

of the same alloy types were sold in the UAE compared to [           ] in Saudi

Arabia.  *See* 3rd Country Memo at 4, P.R.77/C.R.83.  The  [

] sold in the UAE and not in Saudi Arabia, however, only accounted for

[      ] percent of total sales in the United States or [       ] percent of kgs sold in

the United States.  *See generally* Revised Exhibit SA-1, P.R.78/C.R.84.  Compare

this to alloy type [       ] sold in the UAE accounting for [       ] percent of total

sales in the UAE and [       ] percent of kgs sold in the UAE.  *Id.*  [

] that is sold to the United States and the UAE, but not to Saudi Arabia,

accounts for a negligible percentage of total U.S. sales.  Additionally, to the extent

that alloy type was a factor, Saudi Arabian sales were nearly identical to the UAE

17

for alloy **[          ]**, which is the overwhelming alloy sold to the United States,

accounting for more than **[       ]** percent of U.S. total sales.  *Id*.

On this basis, Commerce concludes that "the quality of sales data between

the UAE and Saudi Arabia are not equal."  Final IDM at 5, P.R. 12.  The rationale

of leveraging the alloy type over volume of sales of similar U.S. alloys simply does

not square with the regulatory framework, which is meant to represent the "highest

volume of sales of subject merchandise that is most similar to that sold in the

United States."  *See Husteel Co.*, 491 F. Supp. 2d at 1295.  As such, Commerce did

not follow its practice of selecting the largest third-country market by volume

when all other factors are equal, simply based on **[                ]** accounting only

for **[      ]** percent of total sales in the United States.

While Commerce may have discretion when weighing the factors under 19

C.F.R. § 351.404(e), its determination is not supported by substantial evidence

where it fails to adequately explain the basis on which Commerce made its

decision.  *See Ellwood City Forge Co. v. United States*, Court No. 23-00191, Slip

Op. 26-44 (Ct. Int'l Trade Apr. 28, 2026) at *29 ("discretion, however, does not

relieve Commerce of the obligation to explain its selection in a manner that permits

judicial review.");  *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1319 (Ct. Int'l

Trade 2009) ("Commerce must explain the basis for its decisions; while its

explanations do not have to be perfect, the path of Commerce's decision must be

18

reasonably discernable to a reviewing court.").  Here, Commerce did not provide

the reasoned explanation the regulation requires.  Commerce never explained why

[                                    ] in the UAE – representing only a negligible share

of GARMCO's U.S. sales – made the UAE more representative than Saudi Arabia,

despite Saudi Arabia's far larger sales volume, substantially greater number of

matching sales, and closer overall correspondence to the U.S. sales universe.  By

elevating that marginal product-similarity distinction over the record evidence

demonstrating that Saudi Arabia was the more robust and representative

comparison market, Commerce distorted the regulatory inquiry and failed to

connect its choice to substantial evidence.

Commerce's determination must also be explained when it departs from its

practice in other cases.  *See British Steel PLC v. United States*, 127 F.3d 1471,

1475 (Fed. Cir. 1997) ("'An agency is obligated to follow precedent, and if it

chooses to change, it must explain why.'" (quoting *M.M. & P. Maritime Adv., v.

Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984)).  Here, Commerce's action is not

consistent with its practice of selecting the largest viable market when the relevant

factors are otherwise equal.  *See, e.g.*, *Common Alloy Aluminum Sheet From the

Kingdom of Bahrain: Preliminary Results of Antidumping Duty Administrative

Review; 2024-2025*, 91 Fed. Reg. 42,928, 42,928 (July 13, 2026) and

accompanying Preliminary Issues and Decision Memorandum at 9 (selecting Saudi

19

PUBLIC VERSION

Arabia as the comparison market "because . . . (1) we find that GARMCO's sales to Saudi Arabia has the highest number of sales similar alloy to the U.S., and (2) Saudi Arabia is the largest market most similar U.S. sales volume of subject merchandise during the POR").  Commerce's failure to explain its departure from practice does not support a conclusion that Commerce acted lawfully in this present case.

This Court should therefore hold that Commerce's selection of the UAE, and its corresponding rejection of Saudi Arabia, is unsupported by substantial evidence and otherwise not in accordance with law, and remand for Commerce to select a lawful third-country comparison market or provide a reasoned explanation supported by the record.

### B. Commerce Erred in its Application of the Major Input Rule

Commerce invoked the major input rule without making the threshold finding that the statute requires.  The major input rule is not a general license to replace reported affiliated prices whenever Commerce identifies **[**

**]**.  Rather, Congress authorized Commerce to value a major input based on cost only where Commerce has reasonable grounds to believe or suspect that the affiliated input price is below the supplier's cost of production.  Here, Commerce made no such cost-based finding.  Instead, Commerce compared affiliated and unaffiliated prices and treated that market-price comparison as

20

sufficient to justify a major input adjustment. That approach collapses the distinct statutory inquiries under the transactions disregarded rule and the major input rule, bypasses the prerequisite Congress imposed, and renders Commerce's adjustment unsupported by substantial evidence and contrary to law. The impact on the overall reported costs was significant and punitive.

The major input rule allows Commerce to revalue a "major input to the merchandise" if it has reasonable grounds to believe or suspect that an affiliated-party sale was billed below the cost of the component's production. *See* 19 U.S.C. § 1677b(f)(3). When Commerce applies this rule, it reassesses the input's value. When applying the major input rule (in lawful circumstances), in accordance with 19 C.F.R. § 351.407, Commerce will use the higher of the price paid to the affiliated party (*i.e.*, the transfer price), or the "amount usually reflected in sales of the major input in the market under consideration," (*i.e.*, the market price), or the affiliate's cost of production for the major input (*i.e.*, cost). *See* 19 C.F.R. § 351.407(b).

As noted above, Commerce is only authorized to apply the "major input rule" if it "has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input". *See* 19 U.S.C. § 1677b(f)(3). Separately, pursuant to 19 U.S.C. § 1677b(f)(2), Commerce may disregard a transaction between affiliated persons for a major input of the

21

merchandise under consideration if the transaction "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2)-(3).  This is the "Transactions Disregarded Rule."

To make a determination under the major input rule, Commerce requires reasonable grounds to believe or suspect that an affiliated-party sale was billed below the cost of the component's production.  Commerce must find that the cost of production of the input is greater than the purchase price of the input from the affiliated party.  However, Commerce made no such determination here.

In the Final Analysis Memo, Commerce notes that it finds it appropriate to continue the preliminary major input adjustments.  Commerce states in the Prelim Analysis Memo that "{i}n accordance with section 773(f)(3) of the Act, we tested the affiliated supplier [          ], the primary and secondary (scrap, slab, and ingot) aluminum major input. We found that [          ] unaffiliated sales prices of scrap, ingot, and slab are [                              ] of these inputs to GARMCO; therefore, a major input adjustment is necessary." Prelim Analysis Memo at 3 and Attachment C, P.R.30/C.R.12.

While citing to the major input statute, Commerce also conflates the transactions disregarded rule with the major input rule, finding that the affiliated

transactions do not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. *See* Prelim Analysis Memo at 3 and Attachment C, ("we tested the affiliated supplier" and "found that [          ] unaffiliated sales prices . . . are [

          ]" and "therefore a major input adjustment is necessary") P.R.30/C.R.12. This Court recently remanded a case back to Commerce, explaining that "{a}fter citing the Major Input Rule, however, Commerce set out its practice for establishing market price under the Transactions Disregarded Rule… Although the Major Input Rule may require application of the Transactions Disregarded Rule to determine the input's market price — which is then compared to the transfer price and cost of production — it is not clear whether Commerce followed that process here." *Ellwood City Forge Co. v. United States*, Court No. 23-00191, Slip Op. 26-44 (Ct. Int'l Trade Apr. 28, 2026) at *25. Similarly, Commerce here relies on the major input rule as a basis for revaluing a major input without making the necessary prerequisite findings and conflates the rule with the transactions disregarded rule.

In this review, neither statutory predicate was satisfied. Commerce could not proceed under the transactions disregarded rule because the record did not contain evidence of a reliable market price for the same major inputs used to produce CAAS in the market under consideration – Bahrain. The unaffiliated sales

23

data on which Commerce relied were reported in response to Commerce's request for all of [            ] unaffiliated sales, without limitation by market or product. Those data [

                                                            ]; indeed, the [

                                ] show sales to markets outside Bahrain and sales of multiple products that do not establish comparability to the inputs at issue. *See Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, A-525-001*, "GARMCO's Sixth Supplemental Questionnaire Response" (Jul. 15, 2025) ("GARMCO's SQR6") P.R.39/C.R.17.  Commerce therefore lacked a record basis to find that GARMCO's affiliated purchase prices did not fairly reflect the amount usually reflected in sales of those inputs in Bahrain.

Commerce also could not proceed under the major input rule because the record did not provide reasonable grounds to believe or suspect that GARMCO's transfer prices were below [            ] cost of production.  To the contrary, GARMCO reported [            ] production costs for the relevant inputs, provided cost reconciliations supporting those data, and the record showed that the transfer prices were above cost.  Because the record supports neither a market-price finding under section 1677b(f)(2) nor a below-cost finding under section 1677b(f)(3), Commerce lacked authority to apply the major input rule at all.  Its adjustment to

24

GARMCO's cost of production was therefore unsupported by substantial evidence and contrary to law.

Commerce's final explanation does not cure that defect.  Commerce reasoned that because [

], it was "reasonable" to treat [

] for purposes of 19 C.F.R. § 351.407(b)(2).  But the regulation requires evidence of the "amount usually reflected in sales of the major input in the market under consideration," not merely evidence that [

] that market.  Commerce pointed to no record evidence establishing [

], or whether the [                    ] sales it averaged were the [

].  Nor could Commerce shift that evidentiary gap to GARMCO by faulting GARMCO for not proving that [

].  GARMCO reported exactly the unaffiliated sales information Commerce requested – indeed, more detail than Commerce requested – and the

[                                        ] reflects Commerce's questionnaire, not any failure by GARMCO to cooperate.  To the extent that Commerce attempted to fill a gap in the record without requesting such information, its action was improper and unlawful.  Commerce's reliance on

[                    ] thus substitutes assumption for substantial evidence, reverses

25

the burden to justify Commerce's own adjustment, and fails to address the central point: the record did not contain reliable market-price information for sales of the relevant inputs in Bahrain.

### C. Commerce's Selection of the Earlier of the Shipment Date or Invoice Date as the Date of Sale Is Unsupported by Substantial Evidence and Not in Accordance with Law

Commerce's date-of-sale determination cannot be sustained because Commerce treated later shipment and invoicing events as dispositive while failing to conduct the fact-specific inquiry required by 19 C.F.R. § 351.401(i): that is to say, an examination of when GARMCO and its customers established the material terms of sale. The record showed that the parties reached a meeting of the minds on the contract date, when price, quantity, delivery, and payment terms were fixed in the ordinary course of business. *See, e.g.,* GARMCO's BQR (UAE), P.R.74/C.R.82 at 23. Commerce nevertheless used the earlier of shipment date or invoice date based principally on limited delivery delays caused by COVID-related restrictions and supply-chain disruptions – events outside the parties' control that did not reflect renegotiation, amended pricing, changed quantities, or a new agreement on the material bargain. By equating delayed performance with unsettled material terms, Commerce converted its practice into an irrebuttable rule and ignored record evidence demonstrating that the contract date better reflected when the parties' sales terms were established. Commerce's selection of the earlier

26

**PUBLIC VERSION**

shipment or invoice date is therefore unsupported by substantial evidence and otherwise not in accordance with law.

As noted above, under 19 C.F.R. § 351.401(i), Commerce must use "the date on which the exporter or producer establishes the material terms of sale" as the date of sale. The material terms of sale normally include the price, quantity, delivery terms, and payment terms. *See USEC Inc. v. United States*, 498 F. Supp. 2d 1337, 1343 (Ct. Int'l Trade 2007); *see also Sahaviriya Steel Industries Public Co. Ltd. v. United States*, 714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011) ("In its interpretation of material terms of sale, the Department's practice has evolved to include price, quantity, delivery terms and payment terms") (citations omitted). This Court has emphasized that the "date of sale" analysis must be "a reasoned, case-specific, fact-intensive analysis as to when the parties had a *meeting of the minds* on the material terms of sale." *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1303 (Ct. Int'l Trade 2009) (emphasis added). Indeed, in its explanatory notes accompanying the promulgation of 19 C.F.R. § 351.401(i), Commerce stressed that "{a} preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly "established" in the minds of the buyer and seller." *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,349 (May 19, 1997).

PUBLIC VERSION

Here, Commerce erred in relying on its practice of using the earlier of shipment date or invoice date as the date of sale because the record demonstrates that the material terms of sale were set on the contract date. In its questionnaire responses, GARMCO explained that the material terms for its UAE sales were fixed in the contract. *See* GARMCO's BQR (UAE), P.R.74/C.R.82. In 2022, however, a limited number of sales could not be shipped due to COVID restrictions and impacts, which was outside the control of the parties. Despite these delivery delays that were not agreed upon by the parties but nevertheless were required due to COVID restrictions, GARMCO demonstrated that the material terms of sale (*i.e.*, the meeting of the minds between the parties) were fixed at the contract date, and as a result GARMCO reported the contract date as the date of sale for its UAE sales. *Id*. at 23.

Changes to material contract terms "do not end Commerce's date of sale analysis. Commerce is still required to undertake a factual analysis of the expectations and conduct of the contracting parties, to ascertain when they reached a true meeting of the minds on the material terms of sale." *Nucor*, 612 F. Supp. 2d at 1309. Thus, even if material terms did change, Commerce must still consider whether the changes in terms were in accordance with the parties' expectations and part of their agreement.

**PUBLIC VERSION**

Here, Commerce identified no record evidence showing that the parties reopened negotiations, amended price, changed quantity, altered payment terms, or otherwise reached a new bargain after the contract date. The only change Commerce relied upon was delayed delivery caused by COVID-related restrictions and disruptions – circumstances outside the parties' control and not evidence that the material terms remained unsettled. Treating those delays as dispositive improperly conflates performance under an existing contract with formation of the contract itself. Under 19 C.F.R. § 351.401(i) and this Court's meeting-of-the-minds precedent, Commerce was required to determine when the parties established the material terms of sale, not when performance ultimately occurred. Because the record demonstrates that the parties fixed the material terms on the contract date, Commerce's use of the earlier shipment date or invoice date is unsupported by substantial evidence and otherwise not in accordance with law. The Court should remand with instructions for Commerce to use the contract date as the date of sale, or at minimum to conduct the required fact-specific analysis based on the record evidence rather than the mere existence of delayed delivery.

*    *    *

29

## V.    CONCLUSION

For the reasons explained above, Plaintiff respectfully requests that this Court

enter judgment on the agency record in its favor.


Dated: August 4, 2026                              Respectfully submitted,



                                                   */s/Christine M. Streatfeild*
                                                   Christine M. Streatfeild
                                                   Nathaniel J. Halvorson
                                                   Jasmine Elmasry

                                                   **Baker & McKenzie LLP**
                                                   815 Connecticut Avenue, N.W.
                                                   Washington, DC 20006-4078
                                                   Tel.: (202) 835-6111
                                                   christine.streatfeild@bakermckenzie.com

                                                   *Counsel to Plaintiff Gulf Aluminium*
                                                   *Rolling Mill B.S.C. (C)*

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Memorandum of Law in Support of Plaintiff Gulf Aluminium Rolling Mill B.S.C. (C)'s Rule 56.2 Motion for Judgment on the Agency Record, filed August 4, 2026, contains 6,720 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order issued by the Court on May 29, 2026 (ECF No. 29).

Dated: August 4, 2026                          Respectfully submitted,

                                               */s/Christine M. Streatfeild*
                                               Christine M. Streatfeild
                                               Nathaniel J. Halvorson
                                               Jasmine Elmasry

                                               **Baker & McKenzie LLP**
                                               815 Connecticut Avenue, N.W.
                                               Washington, DC 20006-4078
                                               Tel.: (202) 835-6111
                                               christine.streatfeild@bakermckenzie.com

                                               *Counsel to Plaintiff Gulf Aluminium*
                                               *Rolling Mill B.S.C. (C)*

31