**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| GULF ALUMINIUM ROLLING MILL B.S.C (C),<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant*<br><br>and<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, *et al.*<br><br>*Defendant- Intervenors* | Consol. Court No. 26-02359 |

**ORDER**

Upon consideration of the plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

**ORDERED** that the plaintiff's Rule 56.2 motion for judgment on the agency record is denied; and it is further

**ORDERED** that judgment shall issue for the United States.

Dated: ____________________
New York, New York

___________________________
JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

GULF ALUMINIUM ROLLING MILL B.S.C (C),

*Plaintiff,*

v.

UNITED STATES,

*Defendant*

and

ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, *et al.*

*Defendant- Intervenors*

Consol. Court No. 26-02359

[redacted]

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

NELSON KUAN
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice Civil Division
P.O. Box 480,
Washington, DC 20044
Tel.: (202) 307-0335
Nelson.Kuan@usdoj.gov

OF COUNSEL:
BRAHIM SLEIMAN
Attorney
Of Counsel:
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

October 13, 2026

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

STATEMENT PURSUANT TO RULE 56.2 ........ 2

STATEMENT OF FACTS ........ 2

SUMMARY OF THE ARGUMENT ........ 5

ARGUMENT ........ 6

I. Standard of Review ........ 6

II. Commerce's Selection of the UAE as the Appropriate Third-Country Export Market is Supported by Substantial Evidence and in Accordance with Law ........ 8

A. Legal Framework ........ 8

B. Selection of UAE based on Product Similarity is Supported By Substantial Evidence and In Accordance with the Law. ........ 9

C. Commerce Reasonably Explained Why the UAE's Product Similarity Outweighed Saudi Arabia's Larger Sales Universe ........ 12

D. GARMCO Failed to Exhaust Its Administrative Remedies Regarding Its Challenge to the Potential Inflation of Commerce's Percentage Calculations ........ 13

III. Commerce Correctly Applied the Major Input Rule, in a Manner Supported by Substantial Evidence and in Accordance with Law ........ 15

A. Legal Framework ........ 15

B. Commerce's Application of the Major Input Rule is Reasonable Because it is Based on Record Evidence. ........ 17

C. Plaintiff's Argument that Commerce Conflates the Major Input Rule and Transactions Disregarded Rule is Without Merit and unsupported by the Record. ........ 22

D. GARMCO's Argument that that Commerce Did Not Properly Apply the Transactions Disregarded Rule Is Irrelevant Since the Sale Was of a Major Input ........ 23

IV. Commerce's Decision To Use the Shipment Date as the Date of Sale Is Supported by Substantial Evidence and Otherwise in Accordance with Law ........ 23

A. Legal Framework ........ 23

B. Commerce's Decision to Use GARMCO Shipment Date Is Consistent with the Law and Commerce's Practice. ........ 25

CONCLUSION ........................................................................................................ 29

TABLE OF AUTHORITIES

Page(s)

Cases

*ABB Inc. v. United States*,
355 F.Supp.3d 1206 (Ct. Int'l Trade 2018) .......... 19, 21

*Allied Tube and Conduit Corp. v. United States*,
127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) .......... 24, 25, 26

*Allied Tube and Conduit Corp. v. United States*,
132 F. Supp. 2d 1087 (Ct. Int'l Trade 2001) .......... 25, 28

*Alloy Piping Prods. v. United States*,
201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002) .......... 8

*ArcelorMittal USA LLC v. United States*,
302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) .......... 24, 28

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......... 7

*Best Mattresses Int'l Co v. United States*,
622 F. Supp. 3d 1356 (Ct. Int'l Trade 2023) .......... 15, 17, 18

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) .......... 7

*Colakoglu Metalurji A.S. v. United States*,
394 F. Supp. 2d 1379 (Ct. Int'l Trade 2005) .......... 26

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .......... 7

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) .......... 13

*Diamond Sawblades Mfrs. Coalition v. United States*,
301 F. Supp. 3d 1326 (Ct. Int'l Trade 2018) .......... 13

*Ellwood City Forge Co. v. United States*,
834 F.Supp.3d 1304 (Ct. Int'l Trade 2026) .......... 22, 23

*Eregli Demir ve Çelik Fabrikalari T.A.Ş v. United States*,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) .......... 24, 27

*Fujitsu Gen. Ltd. v. United States*,

88 F. 3d 1034 (Fed. Cir. 1996) ........................................................................................ 6

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ................................................................... 7

*Holmes Prod. Corp. v. United States*,
16 C.I.T. 1101 (1992) ....................................................................................................... 14

*Husteel Co. v. United States*,
463 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ................................................................... 8

*Husteel Co., Ltd. v. United States*.,
491 F. Supp. 2d 1283 (Ct. Int'l Trade 2007) ............................................................. 9, 10

*Huvis Corp. v. United States*,
570 F.3d 1347 (Fed. Cir. 2009) ........................................................................................ 16

*Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*,
77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999) ................................................... 16, 17, 18

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*.,
463 U.S. 29 (1983) ............................................................................................................ 8

*Ninestar Corp. v. United States*,
687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ................................................................. 14

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .................................................................................... 7, 11

*Norsk Hydro Can., Inc. v. United States*,
472 F.3d 1347 (Fed. Cir. 2006) ........................................................................................ 13

*Nucor Corp. v. United States*,
612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ............................................................. 26, 27

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009) ......................................................................................... 7

*Sahaviriya Steel Indus. Public Co. v. United States*,
714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010) ......................................................... 24, 26, 27

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) ............................................................................. 7

*Tosçelik Profil ve sac Endüstrisi A.Ş., v. Unite,*
*d States*, 256 F. Supp. 3d 1260 (Ct. Int'l Trade 2017) ................................................ 25

*United States v. Eurodif S.A*.,
555 U.S. 305 (2009) ............................................................................................................ 7

*Viraj Forgings, Ltd. v. United States*,
283 F. Supp. 2d 1335 (Ct. Int'l Trade 2003) .......... 9, 10, 11, 13

*Viraj Forgings, Ltd. v. United States*,
350 F. Supp 2d 1316 (Ct. Int'l Trade 2004) .......... 9, 12

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) .......... 6

19 U.S.C. § 1677b(a)(1)(B)(i) .......... 8

19 U.S.C. § 1677b(a)(1)(C) .......... 5

19 U.S.C. § 1677b(a)(6)(C)(ii) .......... 9

19 U.S.C. § 1677b(f)(2)–(3) .......... 15, 23

19 U.S.C. § 1677b(f)(3) .......... passim

28 U.S.C. § 2637(d) .......... 13

paragraph (2) of section 1677b(f) .......... 22

Regulations

19 C.F.R. 351.407(b)(2) .......... 6, 20, 22, 23

19 C.F.R. § 351.401 .......... 24, 26

19 C.F.R. § 351.401(I) .......... 4, 24, 25

19 C.F.R. § 351.404(c)(2)(ii) .......... 8, 9, 11

19 C.F.R. § 351.404(e) .......... passim

19 C.F.R. § 351.407 .......... 5

19 C.F.R. § 351.407(b) .......... 15

19 C.F.R. § 351.411 .......... 9

*Antidumping Duties, Countervailing Duties:*,
*Final Rule*, 62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) .......... 8

*Certain Polyester Staple Fiber from the Republic of Korea: Final Results of the 2007-2008 Antidumping Duty Administrati*ve Review,
74 Fed. Reg. 65,517 (Dep't of Commerce Dec. 10, 2009) .......... 24

*Certain Polyester Staple Fiber from the Republic of Korea: Preliminary Results of the 2007/2008 Antidumping Duty Administrative Review,* *74 FR 27281 (June 9, 2009)* ..... 24

*Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Du*ty Orders, 86 Fed. Reg. 22,139 (Dep't of Commerce, ..... 2

*Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Results of Antidumping Duty Administrati*ve Review; 2023-2024, 91 Fed. Reg. 7,250 (Dep't of Commerce, Feb. 17, 2026) ..... 2

*Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Preliminary Results of Antidumping Duty Administrati*ve Review; 2023-2024, 90 Fed. Reg. 37,840 (Preliminary Results) ..... 3

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 49,844 (Dep't of Commerce Jun. 12, 2024) ..... 3

Other Authorities

H.R. Rep. No. 103-316 ..... 24

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| GULF ALUMINIUM ROLLING MILL B.S.C (C), *Plaintiff*, v. UNITED STATES, *Defendant* and ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, *et al.* *Defendant- Intervenors* | Consol. Court No. 26-02359 |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by Plaintiff Gulf Aluminium Rolling Mill B.S.C. (C) (GARMCO) challenging portions of the final results of the United States Department of Commerce's administrative review of the antidumping duty (AD) order covering common alloy aluminum sheets (CAAS) from the Kingdom of Bahrain (Bahrain). *See* GARMCO's Motion for Judgment on The Agency Record, ECF No 31;32.(Plaintiff's Br). Specifically, GARMCO challenges Commerce's determinations to select the United Arab Emirates (UAE) rather than Saudia Arabia as the third country comparison market, its application of the major input rule, and the use of earlier of shipment or invoice date as the date of sale. As we demonstrate below, the Court should sustain Commerce's

determination because it is supported by substantial evidence and is in accordance with the law.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

Plaintiffs challenge aspects of the final results of Commerce's administrative review of the antidumping duty order covering CAAS from Bahrain. 0*See Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Results of Antidumping Duty Administrative Review*; 2023-2024, 91 Fed. Reg. 7,250 (Dep't of Commerce, Feb. 17, 2026) (Final Results) (P.R.11) [1], and accompanying *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Common Alloy Aluminum Sheet from the Kingdom of Bahrain*; 2023-2024 (Feb. 10, 2026) (IDM) (P.R.10, C.R.4).

### II. Issues presented for Review

1. Whether Commerce's decision to select UAE, rather than Saudi Arabia, as the third-country comparison market, is supported by substantial evidence on the record and is in accordance with the law.

2. Whether Commerce's application of the major input rule is supported by substantial evidence and in accordance with law.

3. Whether Commerce's decision to select the earlier of the shipment date or invoice date as the date of sale is supported by substantial evidence and in accordance with the law.

## STATEMENT OF FACTS

Commerce has issued an AD order covering CAAS from Bahrain. *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman,*

---

[1] P.R. and C.R. refer to the public and confidential administrative record, respectively.

*Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22,139 (Dep't of Commerce, April 27, 2021). On June 12, 2024, Commerce initiated the administrative review of the order for the 2023-2024 period of review (POR). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 49,844 (Dep't of Commerce Jun. 12, 2024), (P.R. 123). GARMCO was the only respondent subject to the review. IDM at 7.

Between June 2024 and July 2025, Commerce issued the initial and supplemental questionnaires to GARMCO, who provided the following timely responses: GARMCO's Letters, "Section A Response," July 22, 2024 (AQR) (P.R. 97-109, C.R. 103-125); "Sections D Response," September 3, 2024 (DQR) (P.R. 83, C.R. 88- 94); GARMCO's Letters, "First Supplemental Questionnaire Response," September 25, 2024 (SQR1) (P.R. 79/C.R. 85); "GARMCO's Section B Response," November 15, 2024 (BQR) (P.R. 74/C.R. 82); "Second Supplemental Questionnaire Response," February 11, 2025 (SQR2) (P.R. 62/C.R. 40-74); "Third Supplemental Questionnaire Response," April 24, 2025 (SQR3) (P.R. 54/C.R. 34-39); "Fourth and Fifth Supplemental Questionnaire Response," June 18, 2025 (SQR4/5) (P.R. 44/C.R. 19-31); and "Sixth Supplemental Questionnaires Response," July 15, 2025 (SQR6) (P.R. 39/C.R. 17).

On October 16, 2024, Commerce selected UAE as the third market country comparison market. Third Country Selection Memorandum (Selection Memo) (P.R. 77/C.R. 83). Commerce based its selection primarily because the UAE market possessed a greater percentage of sales of identical merchandise to the merchandise sold in the U.S market than the Saudi Arabian market did. *Id*. at 3-4.

On August 8, 2025, Commerce issued its preliminary results, *Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Preliminary Results of Antidumping Duty Administrative*

*Review*; 2023-2024, 90 Fed. Reg. 37,840 (Preliminary Results) (P.R.34), and accompanying Decision Memorandum for *Preliminary Results of Antidumping Duty Administrative Review of Common Alloy Aluminum Sheet from the Kingdom of Bahrain*; 2023-2024 (PDM) (P.R. 35), and issued a Preliminary Analysis Memorandum on Common Alloy Aluminum Sheet from the Kingdom of Bahrain (Prelim Analysis Memo) (P.R.30/C.R.12).

Consistent with the Selection Memo, Commerce preliminarily selected UAE as a third country comparison market because GARMCO's sales to UAE on the record includes a greater number of products identical to the products GARMCO sold to the United States during the POR. Commerce preliminarily applied the major input rule to GARMCO's purchases of certain inputs from its affiliated supplier. Commerce also used GARMCO's shipment date as the date of sale, because it preceded both the invoice date, consistent with 19 C.F.R. § 351.401(I), and also preceded the contract date. *See* PDM at 8. In addition, Commerce found that the contract date was not appropriate for the date of sale because GARMCO failed to satisfy the delivery obligation for some of the contracted sales. *Id*. at 7.

On September 3, 2025, GARMCO submitted administrative case briefs arguing that (a) Saudi Arabia should be selected as the third-country comparison market, (b) Commerce erred in its application of the major input rule; and (c) Commerce should rely on the contract date for date of sale. *See generally Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, 2023-2024 Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet: GARMCO's Case Brief*, Case No. A-525-001 (GARMCO Case Br.) (P.R.23/C.R.7).

On February 17, 2026, Commerce published its final results, as well as Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Analysis Memorandum (Final Analysis Memo) (P.R. 10/C.R. 4). First, Commerce selected the UAE as the third-country comparison

market because it had the highest percentage of sales of merchandise with identical alloy to GARMCO's U.S. sales during the POR. IDM at 5. Second, Commerce found its application of the major input rule under 19 C.F.R. § 351.407 to be reasonable and non-adverse because Commerce used the reported unaffiliated sales information to determine the value of the major input and selected the relevant market under consideration for purposes of its major input analysis. Final Analysis Memo at 7. Third, Commerce continued to use the earlier of GARMCO's shipment date or invoice date, not the contract date, as the date of sale for both home market and U.S. sales because material terms of the sale were not finalized at the contract date. *Id.* at 9.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's finding that the UAE is the appropriate third-country comparison market. Under 19 U.S.C. § 1677b(a)(1)(C), Commerce may use a third-country market when the statutory requirements are met, and 19 C.F.R. § 351.404(e) directs Commerce to consider product similarity, sales volume, and other appropriate factors when selecting among viable third-country markets. Although Saudi Arabia had a greater sales volume, Commerce considered both sales volume and product similarity. In addition to having a significant, albeit not the largest, overall sales volume, the UAE had the greatest percentage of sales involving products with an alloy matching GARMCO's U.S. sales and the largest number of unique products that were identical matches to products sold to the U.S. during the period of review. Because the relevant factors were not equal, Commerce was not required to select Saudi Arabia based on sales volume alone. Commerce therefore reasonably selected the UAE based on the record as a whole.

Furthermore, the Court should sustain Commerce's application of the major input rule to GARMCO's purchase of major input from an affiliated supplier. Under 19 U.S.C. § 1677b(f)(3),

the major input rule applies when Commerce has reasonable grounds to believe or suspect that the value of a major input purchased from an affiliated supplier is less than the cost of production. Here, Commerce relied on GARMCO's reported purchases of the major input from its affiliated supplier and the affiliated supplier's sales of the input to unaffiliated producers. Commerce used those reported sales from GARMCO's affiliated supplier to unaffiliated producers to determine the value of the major input under 19 C.F.R. 351.407(b)(2). Thus, Commerce satisfied the statutory predicate for applying the major input rule and valued the input using the information on the record.

Lastly, the Court should sustain Commerce's finding that the shipment date is the appropriate date of sale for GARMCO's U.S. sales. Commerce generally presumes the invoice date to be the date of sale but may use another date when Commerce is satisfied that a different date better reflects the date on which the exporter or producer established the material terms of sale. Here, the shipment date precedes the invoice date, and the record showed changes in quantity and delivery between the contract and shipment. GARMCO failed to establish that the material terms of sale were firm and established on the contract date. GARMCO's *force majeure* argument does not provide a basis for departing from Commerce's practice. Commerce thus reasonably selected the shipment date as the date of sale, because the shipment date best reflected the date on which all material terms were established and no longer subject to change.

## ARGUMENT

### I. Standard of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. §

1516a(b)(1)(B)(i)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted). The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it de novo. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that the Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

## II. Commerce's Selection of the UAE as the Appropriate Third-Country Export Market is Supported by Substantial Evidence and in Accordance with Law

### A. Legal Framework

Commerce generally determines normal value based on the price at which the foreign like product is sold in the exporting country. 19 U.S.C. § 1677b(a)(1)(B)(i). If the aggregate quantity of foreign like product sold in the exporting country is less than five percent of the quantity of subject merchandise sold in the United States, however, Commerce may determine normal value based on sales of the foreign like product in a third country. *Id.* § 1677b(a)(1)(C). Commerce may use third-country prices only if those prices are representative, and it may decline to use a third country if it determines that its prices are not representative. *Id.* § 1677b(a)(1)(B)(ii)(I); 19 C.F.R. § 351.404(c)(2)(ii).

Neither the statute nor the regulations define "representative." Nevertheless, Commerce's regulations provide that it will not routinely examine whether third-country prices are representative and that the party seeking to show that third-country prices are not representative bears that burden. *Antidumping Duties, Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,357 (Dep't of Commerce May 19, 1997); *see also Husteel Co. v. United States*, 463 F. Supp. 3d 1334, 1341 (Ct. Int'l Trade 2020); *Alloy Piping Prods. v. United States*, 201 F. Supp. 2d 1267, 1276–77 (Ct. Int'l Trade 2002). Any determination that third-country prices are not representative, like other determinations by Commerce, must be supported by substantial evidence. *Husteel*, 463 F. Supp. 3d at 1341. (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983)).

When more than one viable third-country market is available, 19 C.F.R. § 351.404(e) directs Commerce to consider three factors: (1) the similarity of the foreign like product sold in each third country to the subject merchandise sold in the United States; (2) the volume of sales to

each third country; and (3) any other factors Commerce considers appropriate. "If all other factors are equal," Commerce's practice is "to select as the comparison market the country with the highest volume of sales of subject merchandise that is most similar to that sold in the United States." *Id.*; *see Husteel Co., Ltd. v. United States*., 491 F. Supp. 2d 1283, 1295 (Ct. Int'l Trade 2007) (*Husteel I*). Commerce considers differences in physical characteristics of similar merchandise pursuant to 19 U.S.C. § 1677b(a)(6)(C)(ii) and 19 C.F.R. § 351.411. *Viraj Forgings, Ltd. v. United States*, 350 F. Supp 2d 1316, 1331-32 (Ct. Int'l Trade 2004) (*Viraj Forgings II*).

**B. <u>Selection of UAE based on Product Similarity is Supported By Substantial Evidence and In Accordance with the Law.</u>**

Commerce's selection of UAE as the comparison market is supported by substantial evidence and consistent with its practice. The record demonstrates that GARMCO made [redacted] of sales in each market, UAE and Saudi Arabia. *See* Selection Memo at 4 (citing C.R. 85 at 8). In choosing UAE over Saudi Arabia as the appropriate third-country market, Commerce explained that although Saudi Arabia is the largest market, the UAE had: (1) the greatest percentage of number of sales with similarity to GARMCO's U.S. sales; and (2) the largest numbers of unique products that are identical matches to products sold by GARMCO to the U.S. during the POR. *See* IDM at 5. These findings directly address the factors set forth in 19 C.F.R. § 351.404(e), including product similarity and sales volume. Because the relevant factors were not equal, Saudi Arabia's greater sales volume was not dispositive. *See Husteel Co. I*, 491 F. Supp. 2d at 1295; *Viraj Forgings, Ltd. v. United States*, 283 F. Supp. 2d 1335, 1344–45 (Ct. Int'l Trade 2003) (*Viraj Forgings I*).

GARMCO challenges Commerce's selection of the UAE as the third-country comparison market on multiple grounds. First, GARMCO argues that Commerce unlawfully based its

selection on product similarity, even though, according to GARMCO, "all other record evidence detracted from Saudi Arabia." *Id.* at 12–13. GARMCO further contends that Commerce departed from its practice of "selecting the largest viable market when the relevant factors are otherwise equal." *Id.* at 19. GARMCO is incorrect.

When the relevant factors are otherwise equal, sales volume is determinative. 19 C.F.R. § 351.404(e); *Husteel I*, 491 F. Supp. 2d at 1295. But when the relevant factors are not equal, as is the case here, Commerce may weigh those factors, including the similarity of the foreign like product to the subject merchandise, in selecting the appropriate comparison market. *Id*; *see also Viraj Forgings I*, 283 F. Supp. 2d at 1344-45 ("Commerce is not required to choose the appropriate comparison market solely because the goods are identical, any more than it is required to choose the appropriate comparison market solely because the market is the largest available"). GARMCO therefore misconstrues Commerce's practice by treating sales volume as dispositive even where the other relevant factors differ.

Substantial evidence supports Commerce's finding that the relevant factors were not equal. Saudi Arabia was the larger market, accounting for [redacted] percent of GARMCO's U.S. sales volume of subject merchandise during the POR, compared with [redacted] percent for the UAE. Selection Memo at 3 (citing C.R. 85 at 8). The products sold in the UAE were more comparable to the subject merchandise than those sold in Saudi Arabia when alloy was considered as a physical characteristic. Selection Memo at 4 (citing *id.* at 6, C.R. 85 at 8). Specifically, [redacted] sales transactions to the UAE, representing [redacted] percent of sales, involved an alloy matching that of the U.S. sales. Id. By comparison, [redacted] sales transactions to Saudi Arabia, representing only [redacted] percent of sales, involved a matching alloy. *Id.* Commerce also found that the UAE had the greater number of unique products that were identical matches to products

GARMCO sold in the United States during the POR: [redacted] compared with [redacted] for Saudi Arabia. *Id.* Thus, although Saudi Arabia had the greater sales volume, the merchandise sold in the UAE had the greater degree of product comparability.

GARMCO's focus on Saudi Arabia's greater absolute number and weight of matching-alloy sales does not detract from Commerce's reasonable analysis. *See* Plaintiff's Br. at 15–17. Those figures principally reflect the relative size of the two markets and do not establish that a greater proportion of the merchandise sold in Saudi Arabia was comparable to GARMCO's U.S. sales. Commerce instead considered the percentage of sales involving matching alloys as well as the number of products that had identical matches to products GARMCO sold in the United States, which measured the relative extent to which merchandise in each potential comparison market could be matched to merchandise sold in the United States. That approach is consistent with *Viraj Forgings I*. There, the Court explained that Commerce was not required to choose the largest market to which manufacturers exported flanges made to the same standard as their exports to the United States. 283 F. Supp. 2d at 1345. Rather, the Court required Commerce on remand to ensure that it compared the most similar products when considering weight as a physical characteristic of the subject merchandise. *Id.* at 1357. The Court cautioned that selecting a third country based on sales volume without considering merchandise similarity could result in comparisons of products that were sufficiently dissimilar that the resulting matches would be based on constructed value rather than on a price-to-price basis, contrary to the logic of 19 C.F.R. § 351.404(e). *Id.* By merely identifying a greater absolute volume of matching-alloy sales in Saudi Arabia, without regard to the number of products (or models) that have identical matches, GARMCO has not established error

Commerce's analysis is consistent with this Court's interpretation of 19 C.F.R. §

351.404(e). In *Viraj Forgings II*, the Court explained that Commerce is "first instructed to look to a third country that has a product similar to that sold in the United States, and if this is not feasible, to look to a third country that has a large volume of sales." 350 F. Supp. 2d at 1324. The Court accordingly rejected Commerce's selection of a third-country market based solely on sales volume where Commerce had not indicated that it considered the other regulatory criteria. *Id* at 1326. Here, consistent with the holding in *Viraj Forgings II*, Commerce first examined the similarity of the products in each of the potential third-country markets to those sold in the United States and determining that, together with the other relevant factors, the UAE provided the most comparable market. Selection Memo at 3-4. Commerce did not select the UAE based solely on product similarity, nor did it disregard Saudi Arabia's larger sales volume. Rather, Commerce expressly considered sales volume and recognized Saudi Arabia's advantage on that factor. *Id.*; *see also* IDM at 5. Specifically, Commerce explained that the UAE: (1) satisfies the five-percent viability test as a third-country comparison market; (2) has more superior sales data than Saudi Arabia with the greatest percentage of sales with similarity to GARMCO's U.S. sales; and (3) the largest number of unique products that are identical matches to products sold by GARMCO to the U.S. during the POR. IDM at 5. Because the relevant factors were not equal, Commerce was not required to select Saudi Arabia simply because it had the greater sales volume. Rather, Commerce reasonably considered the competing factors identified in the regulation and selected the comparison market based on the totality of the relevant record evidence.

### C. <u>Commerce Reasonably Explained Why the UAE's Product Similarity Outweighed Saudi Arabia's Larger Sales Universe</u>

GARMCO argues that Commerce failed to adequately explain its reasoning for why the "marginal difference" of the UAE's [redacted] outweighed Saudi Arabia's "far larger

and more representative sales universe." Plaintiff's Br. at 13. Commerce stated that "while GARMCO's sales of aluminum sheet to Saudi Arabia during the POR were greater in quantity than its sales to the UAE, GARMCO's sales to the UAE are also significant and that the UAE has the largest number of unique products matching GARMCO's sales to the United States during the POR, serving as the better comparison market." *See generally* Selection Memo; IDM at 4-5. Here, Commerce determined that the similarity of sales for the UAE and Saudi Arabia markets is not equal. *Id.* This accords with Commerce's policy of selecting a third-country comparison market that enhances the accuracy in matching more identical products between comparison market sales and the U.S. sales, and the reason for why Commerce selected UAE over Saudi Arabia. *Viraj Forgings I*, 266 F.3d at 1375.

### D. **GARMCO Failed to Exhaust Its Administrative Remedies Regarding Its Challenge to the Potential Inflation of Commerce's Percentage Calculations**

GARMCO failed to exhaust its administrative remedies regarding its argument that "the proportion of alloy types sold to the third country matching the alloy types sold to the U.S. with respect to their own total sales . . . is easily inflated by their number of sales or lack of sales." Plaintiff's Br. at 16. Under 28 U.S.C. § 2637(d), this Court "shall, where appropriate, require the exhaustion of administrative remedies." The exhaustion doctrine applies to remand proceedings before Commerce. The exhaustion requirement requires parties to present their arguments to Commerce with sufficient specificity. *Diamond Sawblades Mfrs. Coalition v. United States*, 301 F. Supp. 3d 1326, 1354–55 (Ct. Int'l Trade 2018). This Court takes a strict view of the requirement that parties exhaust their administrative remedies before Commerce. *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007); *see also Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1356 n. 17 (Fed. Cir. 2006).

GARMCO never raised this argument before Commerce. In its administrative case brief,

GARMCO challenged Commerce's selection of the UAE based on the greater sales volume, number of sales transactions, and alloy overlap in Saudi Arabia. *See* GARMCO Case Brief at 5–7 (P.R. 23/C.R. 7). GARMCO never argued that Commerce's percentages were "easily inflated" because they measured matching sales against each third country's own total sales. Nor did GARMCO contend that the number or lack of sales could inflate those percentages. At most, GARMCO argued that the UAE's percentage of sales involving matching alloy types did not justify selecting the UAE because Saudi Arabia had substantially greater sales volume and number of sales. *Id*. Even then, however, GARMCO made no argument that Commerce's percentages could be inflated by the number or lack of sales in the third-country market, nor any objection to the calculation methodology. GARMCO had an adequate opportunity to raise this issue before Commerce but did not do so.

Furthermore, none of the recognized exceptions to exhaustion applies. *See Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1326 (Ct. Int'l Trade 2024) (identifying exceptions for pure questions of law, lack of timely access to the confidential record, intervening judicial decisions, and futility); *Holmes Prod. Corp. v. United States*, 16 C.I.T. 1101, 1104 (1992) (recognizing an exception where another party raised the issue or Commerce otherwise had an opportunity to consider it). GARMCO's argument does not present a pure question of law. GARMCO had access to the relevant information and adequate opportunities to challenge Commerce's calculations before the agency. There was no intervening judicial decision affecting this issue, and raising the argument before Commerce would not have been futile. Accordingly, because GARMCO failed to exhaust this specific argument, the Court should decline to consider it.

For these reasons, Commerce's decision to rely on UAE as the appropriate third-country

comparison is supported by substantial evidence and in accordance with law.

### III. Commerce Correctly Applied the Major Input Rule, in a Manner Supported by Substantial Evidence and in Accordance with Law

#### A. Legal Framework

When calculating normal value, Commerce may substitute the prices of transactions between affiliated parties under the transactions disregarded and major input rules if it determines that the reported amounts do not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market or are below the cost of production. *See* 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R. § 351.407(b) (outlining methods for valuing a major input). The major input rule provides:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under {the transactions disregarded rule}.

19 U.S.C. § 1677b(f)(3).

Commerce's regulations provide that Commerce "normally will determine the value of a major input purchased from an affiliated person based on the higher of:

> (1) The price paid by the exporter or producer to the affiliated person for the major input;
> (2) The amount usually reflected in sales of the major input in the market under consideration; or
> (3) The cost to the affiliated person of producing the major input.

19 C.F.R. §351.407(b).

The purpose of the major input rule is to ensure that Commerce's determination of the normal value of subject merchandise most accurately reflects the value of the input and avoid distortions like those from "exporters' cost-sharing arrangements with affiliates . . . ." *See Best*

*Mattresses Int'l Co v. United States*, 622 F. Supp. 3d 1356, 1359 (Ct. Int'l Trade 2023). A reported lower cost based on transaction between affiliates that accurately reflects the value of the input may make a producer's comparison-market sales more likely to pass the sales-below-cost test, which can distort the weighted-average dumping margin Commerce ultimately calculates for that producer. In turn, the dumping duty applied to the producer's exports to the United States will not fully offset the unfair price at which the producer sells the subject merchandise to U.S. importers.

This Court reviews Commerce's application of the major input rule for substantial evidence and in accordance with the law. *See Huvis Corp. v. United States*, 570 F.3d 1347, 1351-53 (Fed. Cir. 2009). Under this regulation, Commerce determines the value of a major input purchased by an exporting producer from an affiliated supplier by selecting the highest of three values: (1) the price the producer paid the affiliated supplier for the major input; (2) the "usually reflected" price of the major input in the supplier's sales in the market under consideration; or (3) the affiliated supplier's cost of production for the major input.

The major input rule "simply sets forth a general rule for affiliated parties transactions which provides that, for purposes of calculating cost of production and constructed value, Commerce may disregard such transactions when 'the amount representing {the transfer price} does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration" (i.e., market price)." *Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 77 F. Supp. 2d 1302, 1310 (Ct. Int'l Trade 1999). "{T}his provision allows Commerce, in the absence of other transactions between non-affiliated parties, to use information available concerning market prices to value the 'cost' of an affiliated-party input." *Id*. In addition, this Court has recognized Commerce's "flexibility to

choose the appropriate market {under consideration}" to use in the major input rule analysis. *Best Mattresses*, 622 F. Supp. 3d at 1384. Further, the statutory term "market under consideration" is "purposefully broad" to enable Commerce to select a market that reasonably reflects the market value for the major input. *Id*. When selecting a market, Commerce should consider factors such as the types of products in each possible market, and whether it should choose the market with products that are more comparable. *Id*. If the producer suggests alternative markets that it claims better reflect arm's length prices for the major input, Commerce should explain why its choice of market is better than the producer's suggestion so the court can review its analysis. *Id*.

This Court has found a range of methods of market selection to be reasonable in Commerce's application of the major input rule and selection of the market under consideration under 351.407 (b)(2). *See Mannesmann*, 77 F. Supp. 2d at 1307; *Best Mattresses*, 622 F. Supp. 3d at 1358. Commerce may determine market value by comparing the relative prices of the widgets that the producer purchased from affiliated suppliers to those it purchased from unaffiliated suppliers during the period of review. *See Mannesmann*, 77 F. Supp. 2d at 1307.

### B. Commerce's Application of the Major Input Rule is Reasonable Because it is Based on Record Evidence.

This Court should sustain Commerce's application of the major input rule because Commerce used the information available on the record to determine the value of the input and selected a market under consideration based on the sales information GARMCO provided, thereby accounting for GARMCO's purchase of a major input from an affiliated supplier in calculating GARMCO's cost of production. *See Best Mattresses*, 622 F. Supp. 3d at 1358. Specifically, Commerce analyzed GARMCO's purchases of [redacted] from its affiliated supplier and the affiliated supplier's sales of those inputs to unaffiliated producers. *See*

GARMCO's Letter, SQR6. Commerce used that information to establish the market under consideration and determine the value of the major input pursuant to 351.407(b)(2). *See* Final Analysis Memo at 2-4 (citing SQR6, Exhibit SQ6-1 and Attachment C). Commerce found GARMCO's proposed alternatives to be insufficient because they rely on selectively chosen data and speculative assumptions about particular unaffiliated customers and sales that GARMCO did not support with record evidence. *See* Final IDM at 7–8; Final Analysis Memo at 2–4. Commerce therefore reasonably declined to replace its record-based methodology with alternatives that would require speculation and cherry-picking. Thus, Commerce applied the major input rule based on the information available on the record, which GARMCO itself reported, and provided sufficient explanation. *See Best Mattresses*, 622 F. Supp. 3d at 1376-77.

GARMCO first argues that Commerce did not have reasonable grounds to believe or suspect that the value of the major input was less than [redacted] and therefore did not satisfy the statutory predicate for applying the major input rule. Plaintiff's Br. at 20–21. GARMCO contends that Commerce must find that the price of the major input is less than the affiliated supplier's cost of production before the statutory reasonableness standard is satisfied. *See* Plaintiff's Br. at 22. The statute requires only "reasonable grounds to believe or suspect," not an affirmative finding that the price was below the affiliated supplier's cost of production. *See Mannesmann*, 77 F. Supp. 2d at 1310 (citing 19 U.S.C. § 1677b(f)(3)). Indeed, "reasonable grounds to believe or suspect" establishes a lower threshold than an affirmative finding. *See* 19 U.S.C. § 1677b(f)(3).

Commerce satisfied that threshold based on the information GARMCO provided concerning its purchases of the major input from its affiliated supplier and the affiliated supplier's sales of the input to unaffiliated producers. This evidence demonstrated that

GARMCO's affiliated supplier charged higher prices to unaffiliated producers than to GARMCO, its affiliate. *See* SQR6, Exhibit SQ6-1. GARMCO itself certified the accuracy and completeness of the information it submitted to Commerce. Specifically, GARMCO's chief executive officer and counsel certified that "the information contained in this submission is accurate and complete to the best of my knowledge". *See* SQR6, Certifications at pdf pages 5-6. GARMCO is an experienced respondent that was aware of Commerce's major input adjustment practice, including the information required for that analysis. IDM at 7. Yet GARMCO did not argue that Commerce's major input adjustment in the investigation was unlawful or provide record evidence demonstrating that the adjustment, as applied in this review, was inconsistent with the statute, regulation or the evidence of the record. *Id.* Nor did GARMCO provide more detailed or segregated information to support a different adjustment. *Id.* Commerce thus reasonably relied on the information GARMCO provided. As this Court has recognized, Commerce is not required to seek assurance from a respondent that information appearing complete is complete and accurate. *ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1222 (Ct. Int'l Trade 2018).

GARMCO also argues that Commerce erred in applying the major input rule because it did not establish that the unaffiliated sales it examined were comparable sales in the same market. Plaintiff's Br. at 20–21. Specifically, GARMCO contends that Commerce could not rely on the affiliated supplier's sales to unaffiliated customers because the record allegedly does not establish where those sales occurred or whether the products sold were the same or similar to the major input used to produce the subject merchandise. *Id.* Commerce, however, selected a market under consideration pursuant to 19 C.F.R. § 351.407(b)(2) and used sales of [redacted] by the affiliated supplier to unaffiliated producers to determine the value of the major

input. Final Analysis Memo at 2. GARMCO has not identified any record evidence that would establish that [redacted] sold to unaffiliated producers were dissimilar to [redacted] sold to GARMCO or were sold in a different market. GARMCO's speculation about the possibility of such differences in the reported transactions is not a substitute for actual record evidence.

GARMCO's speculation regarding the unaffiliated sales data, which it reported, does not establish that Commerce lacked a sufficient basis to use those sales in determining the value of the major input. GARMCO argues that the record did not identify the country of sale for the unaffiliated transactions or establish that the products sold were the same inputs used to produce CAAS. Plaintiff's Br. at 23–25. But GARMCO has not demonstrated that the affiliated supplier's sales of the major input to [redacted] occurred outside Bahrain. Final Analysis Memo at 2. GARMCO identified only [redacted] unaffiliated customers for which it alleged that sales occurred outside Bahrain; it did not specifically allege that sales to the other unaffiliated customers, [redacted] took place outside Bahrain. *Id.* at 2–3. Thus, GARMCO's assertion that the record establishes that the unaffiliated sales occurred outside Bahrain fails to account for the record as a whole.

Nor does GARMCO establish that the products sold to unaffiliated customers could not be used to produce the subject merchandise. In its supplemental response, GARMCO did not indicate that there are certain types of the same inputs that can be used in the production of aluminum sheet and other types of the same inputs that cannot be used in the production of aluminum sheet. IDM at 7; *see* SQR6, Exhibit SQ6-1. GARMCO therefore provided information that Commerce determined was complete for purposes of conducting the major input analysis. *Id.* GARMCO's contention that Commerce was required to establish additional

product distinctions is not supported by the information GARMCO reported on the record.

GARMCO further contends that "Commerce's reliance on {affiliated supplier} [redacted] thus substitutes assumption for evidence" and "fails to address the central point: the record did not contain reliable market-price information for sales of the relevant inputs in Bahrain." Plaintiff's Br. at 25–26. Commerce's analysis did not rest on that factor, [redacted] alone. Commerce considered evidence regarding [redacted] unaffiliated customers, which were all located in Bahrain, and found that GARMCO had not established that the remaining unaffiliated sales occurred outside Bahrain. Final Analysis Memo at 2–3. GARMCO thus mischaracterizes the explanation provided by Commerce. Commerce's explanation rather rejected GARMO's attempt to argue that the majority of the unaffiliated sales as occurring outside Bahrain when GARMCO had not established that fact because the record evidence demonstrated that transactions at issue occurred between companies located in Bahrain.

Finally, Plaintiff argues that Commerce improperly shifted the burden to GARMCO for failing to provide information that Commerce did not request. Plaintiff Br. at 24–25. But Commerce's conclusion was based on the information GARMCO submitted, including its supplemental response, which Commerce found sufficiently complete to conduct the major input analysis. IDM at 7–8. Commerce may rely on information that appears complete, which the respondent certified, and is not required to seek additional assurances from a respondent concerning the completeness or accuracy of that information. *ABB,* 355 F. Supp. 3d at 1222. Where GARMCO's submission did not distinguish between types of inputs or establish that any, let alone the majority, of the unaffiliated sales occurred outside Bahrain, Commerce had no basis in the record to make those assumptions in GARMCO's favor.

Accordingly, GARMCO's arguments do not identify a deficiency in Commerce's

application of the major input rule to the record evidence before it. Commerce had the requisite reasonable grounds to apply the rule, relied on information that GARMCO reported concerning the affiliated and unaffiliated transactions, selected a market under consideration consistent with 19 C.F.R. § 351.407(b)(2), and explained why the record did not support GARMCO's proposed alternatives. This Court should sustain Commerce's application of the major input rule.

### C. <u>Plaintiff's Argument that Commerce Conflates the Major Input Rule and Transactions Disregarded Rule is Without Merit and unsupported by the Record.</u>

Plaintiff argues that Commerce conflated the major input rule with the transactions disregarded rule by treating the comparison between GARMCO's affiliated purchase prices and the affiliated supplier's unaffiliated sales prices as sufficient to apply the major input rule. Plaintiff's Br. at 22–24 (citing *Ellwood City Forge Co. v. United States*, 834 F.Supp.3d 1304, 1319-20 (Ct. Int'l Trade 2026)). That argument misconstrues Commerce's analysis. Commerce used the unaffiliated sales information to determine the value of the major input under § 351.407(b)(2) and then applied that value in conducting the major input adjustment to GARMCO's affiliated purchases. Final Analysis Memo at 2–4.

The fact that Commerce considered unaffiliated sales prices does not mean that Commerce conflated the two statutory provisions. Section 1677b(f)(3) contemplates using the value determined under the transactions disregarded rule of paragraph (2) of section 1677b(f) when determining the value of a major input under paragraph (3). Thus, Commerce lawfully considered the unaffiliated sales data to establish the market value of the input and used that value in its major input analysis. *See* 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R. § 351.407(b)(2). This approach is consistent with *Ellwood*, which recognized that the major input rule may require application of the transactions disregarded rule to determine the input's market price, which is then compared with the transfer price and cost of production. *Ellwood*, 834 F. Supp. 3d

at 1319. Unlike the situation identified in *Ellwood*, Commerce here explained how it used the unaffiliated sales information to determine the value of the major input and why that information supported its adjustment. *See* Final Analysis Memo at 2–4. It is therefore GARMCO, not Commerce, that conflates the two provisions by characterizing Commerce's consideration of the affiliated supplier's unaffiliated sales as an application of the transactions disregarded rule. Commerce did not apply the transactions disregarded rule to GARMCO's purchases; rather, it applied the major input rule and considered the supplier's unaffiliated sales as evidence of the major input's market value in conducting that analysis. *Compare id*. *with* Plaintiff's Br. at 22–24. Commerce did not collapse the two rules into one; it used the market-value analysis contemplated by 1677b(f)(2) as part of its application of the major input rule under 1677b(f)(3), consistent with the statutory language.

### D. GARMCO's Argument that that Commerce Did Not Properly Apply the Transactions Disregarded Rule Is Irrelevant Since the Sale Was of a Major Input

GARMCO argues that Commerce did not satisfy the statutory predicate to apply the transactions disregarded rule. *See* Plaintiff's Br. at 23. This argument is misplaced. Commerce's consideration of the sale in question required the application of the major input rule, and Commerce correctly applied the major input rule for the reasons stated above.

Thus, for the reasons discussed above, GARMCO's arguments are unpersuasive. Commerce applied the major input rule in a manner supported by substantial evidence and in accordance with law.

## IV. Commerce's Decision To Use the Shipment Date as the Date of Sale Is Supported by Substantial Evidence and Otherwise in Accordance with Law

### A. Legal Framework

When conducting comparisons of U.S. sales with concurrent home market or third

country sales, Commerce must establish the dates of sale. 19 C.F.R. § 351.401. The SAA defines the "date of sale" as the "date when the material terms of sale are established." Statement of Administrative Action for Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I, at 810 (1994) (SAA). Commerce considers "material terms of sale" to include price, quantity, and delivery and payment terms. *See Sahaviriya Steel Indus. Public Co. v. United States*, 714 F. Supp. 2d 1263, 1279-80 (Ct. Int'l Trade 2010) (citations omitted), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011); *see also Eregli Demir ve Çelik Fabrikalari T.A.Ş v. United States*, 308 F. Supp. 3d 1297, 1306-07 (Ct. Int'l Trade 2018).

In accordance with the SAA, Commerce's regulations establish a presumption that the date of sale is the invoice date, as recorded in the exporter or producer's records kept in the ordinary course of business. 19 C.F.R. § 351.401(i); *see also Certain Polyester Staple Fiber from the Republic of Korea: Preliminary Results of the 2007/2008 Antidumping Duty Administrative Review, 74 FR 27281, 27283 (June 9, 2009), unchanged in Certain Polyester Staple Fiber from the Republic of Korea: Final Results of the 2007-2008 Antidumping Duty Administrative Review*, 74 Fed. Reg. 65,517 (Dep't of Commerce Dec. 10, 2009). When the shipment date precedes the invoice date, Commerce generally finds that the shipment date better reflects the date on which material terms are established. *Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 220 (Ct. Int'l Trade 2000); *see also Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80.

The burden of establishing a date of sale other than the invoice date is on the party that seeks to establish the different date of sale. *See Sahaviriya Steel*, 714 F. Supp. 2d at 1279-1280. To do so, the party must demonstrate that the material terms of sale were "firmly" and "finally" established on its proposed date. *ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366,

1375-76 (Ct. Int'l Trade 2018) (internal citations omitted). The party must do more than "only create some doubt about when material terms are set." *See Tosçelik Profil ve sac Endüstrisi A.Ş., v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017). "{U}nless the party seeking to establish a date of sale other than the invoice date produces sufficient evidence to overcome this presumption, Commerce will use invoice date as the date of sale." *Allied Tube I*, 127 F. Supp. 2d at 220.

**B. Commerce's Decision to Use GARMCO Shipment Date Is Consistent with the Law and Commerce's Practice.**

Commerce's decision to use GARMCO's shipment date as the date of sale is consistent with the statute and with Commerce's practice and supported by substantial evidence. Commerce may use a different date where record evidence demonstrates that the material terms of sale were established earlier. 19 C.F.R. § 351.401(i); *see Allied Tube and Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (Ct. Int'l Trade 2001) (*Allied Tube II*). In its supplemental response, GARMCO reported the sales contract date as the comparison market sale and the invoice date as U.S. sale. *See* SQR2 at 7-8. Commerce examined GARMCO's U.S. sales data and found that the shipment date preceded invoice date for the transactions at issue, and GARMCO's contract date. IDM at 10-11. Commerce has a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established. *Allied Tube I*, 127 F. Supp. 2d at 220. Applying that practice here, Commerce concluded that the shipment date provided a reliable date of sale for GARMCO's U.S. transactions and for antidumping purposes.

Significantly, GARMCO does not contend that Commerce should have used invoice date, but rather advocates for the use of contract date. *See* Plaintiff's Br. at 26-29. GARMCO attempts to shift its burden, as the party seeking an alternative date of sale, on to Commerce to

support its decision by arguing that Commerce "identified no record evidence showing that the parties reopened negotiations, amended price, changed quantity, altered payment terms, or otherwise reached a new bargain after the contract date." *Id*. at 29. However, the date of sale regulation, 19 C.F.R. § 351.401, establishes a "rebuttable presumption" for the agency to use final invoice date as date of sale. This Court has previously upheld Commerce's rebuttal presumption when selecting date of sale for antidumping proceedings. *See Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1307 (Ct. Int'l Trade 2009) (citing *Colakoglu Metalurji A.S. v. United States*, 394 F. Supp. 2d 1379, 1380-81 (Ct. Int'l Trade 2005)). Because the shipment date preceded the invoice date, consistent with its long-standing practice, Commerce lawfully selected the shipment date as the date of sale. IDM at 9; *see also Allied Tube I*, 127 F. Supp. 2d at 220; *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80.

Commerce is not required to justify using the shipment date, in the absence of evidence identified by GARMCO that the material terms of sale were established on an alternative date. *See Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80. As the party seeking an alternative date of sale, GARMCO must demonstrate evidence of "sufficient weight and authority as to justify its factual conclusions as the only reasonable outcome." *Allied Tube I*, 127 F. Supp 2d at 220. GARMCO, however, has failed to demonstrate that contract date, which it advocates, better establishes the date on which all material terms were established. Indeed, record evidence demonstrates that material terms of sale changed after the contract date. *See* SQR2, Exhibit SQ2-8. By failing to meet its burden of proof as the party seeking an alternative date of sale, GARMCO fails to show why Commerce should depart from its established practice and choose the contract date as the date on which the material terms were established.

GARMCO asserts that the record demonstrates the material terms of sale were set on the

contract date. Plaintiff's Br. at 28. However, substantial evidence supports Commerce's finding that the shipment date reflects the first meeting of the minds of the material terms of sale. "{M}aterial terms of sale may include price, quantity, and delivery and payment terms." *Eregli Demir*, 308 F. Supp. 3d at 1306-07 (citing *Sahaviriya Steel*, 714 F. Supp. 2d at 1280). "{E}vidence that material terms of sale changed after the contract date is relevant in determining the date on which the parties had a material meeting of the mind." *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1312 (Ct. Int'l Trade 2009). Further, this Court explained that "(i)n choosing a date of sale, Commerce weighs the evidence presented and determines the significance of any changes to the terms of sale involved." *See Sahaviriya Steel*, 714 F. Supp. 2d at 1263.

Here, Commerce weighed the evidence and determined that changes in the material terms of sale, *i.e.*, quantity and delivery, occurred after the contract date. GARMCO goes to great lengths to establish that the price and quantity were established by the sales contract and stated that the "contract delivery date" was when the delivery was "supposed to occur." IDM at 10 (citing SQR2 at 7-8; GARMCO's Case Brief at 20). Yet, the record evidence demonstrates that at least two material terms of sale had changed between the contract date and the shipment date in the sales trace. Final Analysis Memo at 4. Commerce explained that the quantity changed from [redacted] kilograms in the contract to [redacted] kilograms in the invoice and the packing list. *Id*. (citing SQR2, Exhibit SQ2-8). Additionally, the contract listed the expected delivery date as [redacted] but the actual shipment date in the bill of lading was [redacted] Final Analysis Memo at 4 (citing SQR2, Exhibit SQ2-8). Not only does equating the contract delivery date to the date on which delivery was "supposed to occur" imply that the material term of sale were not finalized at that contract date, IDM at 10, deliveries did in fact take place well

after the contract delivery date and with a change in quantity, Final Analysis Memo at 4 (citing SQR2, Exhibit SQ2-8). This Court has held that Commerce will use the alternative date as the date of sale when the terms of sale are "firmly established and not merely proposed." *ArcelorMittal*, 302 F. Supp. 3d at 1375.

Additionally, this Court clarified that "if there is a change in price and/or quantity after the proposed date, and the Department fails to provide a rational explanation as to why such a change is not meaningful for date of sale analysis, then Commerce is bound under the regulation to employ invoice date as the date of sale." *Allied Tube & Conduit Corp. v. United States*, 25 C.I.T 23, 25 (2001) (*Allied Tube III*). Here, there was a change in quality and date of delivery, so consistent with this Court's decision in *Allied Tube III*, Commerce considered these changes and selected the shipment date rather than the earlier contract date as the date of sale. Thus, GARMCO has failed to establish that the terms of sale were "firmly" established on the contract date.

Citing no record evidence or authority, GARMCO urges a departure from Commerce's well-established practice by claiming that "a limited number of sales could not be shipped due to COVID restrictions and impacts, which was outside the control of the parties." Plaintiff's Br. at 28. Even considering the COVID pandemic as a force majeure, nothing in Commerce's regulations or case precedent provides a force majeure exception in selecting a date other than the earlier of the shipment date or the invoice date as the date of sale even when that other date is not the date in which the material terms of sale are finalized. As Commerce explained, a change to the delivery terms in the contract due to force majeure would indicate a contractual amendment or revision, which would make the material terms of sale in the contract subject to change for all reported sales. *Id*. Leaving aside the speculative nature of GARMCO's

assertions, Commerce was not required to consider a force majeure claim when selecting the date of sale, this assertion is incorrect, and Commerce's finding that the earlier shipment date is the date of sale is lawful.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiff's motion, sustain Commerce's final results and enter judgment for the United States.

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

NELSON KUAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480,
Washington, DC 20044
Tel.: (202) 307-0335
Nelson.Kuan@usdoj.gov

Attorneys for Defendant

OF COUNSEL:
BRAHIM SLEIMAN
Attorney
Of Counsel:
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

October 13, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the attached Defendant's Response to Plaintiff's Motion for Judgment on the Agency Record, contains 8,685 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order issued by the Court on May 29, 2026, ECF 29.

*/s/ Nelson Kuan*

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 13, 2026, I caused a copy of the foregoing brief to be served, via CM/ECF and electronic file transfer, on all counsel of record.

*/s/ Nelson Kuan*