NONCONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| GULF ALUMINIUM ROLLING MILL B.S.C. (C),<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al.,<br><br>Defendant-Intervenors. | Court No. 26-02359 |

**DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD**

JOHN M. HERRMANN
GRACE W. KIM
KELLEY DRYE & WARREN LLP
670 Maine Avenue, SW, Suite 600
Washington, DC 20024
(202) 342-8400

JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(202) 342-8867

Counsel to Defendant-Intervenors

Dated: October 27, 2026

# TABLE OF CONTENTS

Page

ADMINISTRATIVE DETERMINATION UNDER REVIEW .................... 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT .................... 2

STATEMENT OF FACTS .................... 4

STANDARD OF REVIEW .................... 8

ARGUMENT .................... 10

I. COMMERCE'S SELECTION OF THE UAE AS THE THIRD-COUNTRY COMPARISON MARKET IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW .................... 10

A. Legal Framework .................... 10

B. Commerce Properly Prioritized Product Similarity in Selecting the UAE Over Saudi Arabia as the Third-Country Comparison Market .................... 13

C. Commerce Reasonably Explained Why the UAE's Product Similarity Outweighed Saudi Arabia's Larger Sales Volume .................... 19

II. COMMERCE'S APPLICATION OF THE MAJOR INPUT RULE IS LAWFUL AND SUPPORTED BY SUBSTANTIAL EVIDENCE .................... 22

A. Commerce Satisfied the Statutory Threshold in Invoking the Major Input Rule .................... 22

B. Commerce Lawfully Utilized GARMCO's Unaffiliated Sales Data in Applying the Major Input Rule .................... 24

III. COMMERCE'S RELIANCE ON THE EARLIER OF THE SHIPMENT DATE OR INVOICE DATE AS THE DATE OF SALE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW .................... 28

IV. CONCLUSION .................... 31

**NONCONFIDENTIAL**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Akzo N.V. v. USITC,
808 F.2d 1471 (Fed. Cir. 1986)....9

Allied Tube and Conduit Corp. v. United States,
127 F. Supp. 2d 207 (Ct. Int'l Trade 2000)....29

Alloy Piping Prods. v. United States,
201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002), aff'd on other grounds, 334 F.3d 1284 (Fed. Cir. 2003)....11

ArcelorMittal USA LLC v. United States,
302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018)....29

Carbon Activated Tianjin Co. v. United States,
633 F. Supp. 3d 1329 (Ct. Int'l Trade 2023)....9

Consolidated Edison Co. v. N.L.R.B.,
305 U.S. 197 (1938)....8, 9

Consolo. v. Fed. Mar. Comm'n,
383 U.S. 607 (1966)....9

Dong-A Steel Co. v. United States,
337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018)....29

Dorbest Ltd. v. United States,
604 F. 3d 1363 (Fed. Cir. 2010)....16

Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018)....28, 30

Giorgio Foods, Inc. v. United States,
No. 23-00133, Slip Op. 24-79 2024 Ct. Intl. Trade LEXIS 84 (Ct. Int'l Trade July 17, 2024)....11, 12, 13, 14

Husteel Co. v. United States,
520 F. Supp. 3d 1296 (Ct. Int'l Trade 2021)....11

Husteel Co. v. United States,
558 F. Supp. 2d 1357 (Ct. Int'l Trade 2008)....11

Husteel Co. v United States,
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ....................25

Kearns v. Chrysler Corp.,
32 F.3d 1541 (Fed. Cir. 1994)....................9

Mannesmannrohren-Werke AG v. United States,
77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999) ....................23

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,
463 U.S. 29 (1983)....................8

Nippon Steel Corp. v. United States,
458 F.3d 1345 (Fed. Cir. 2006)....................8

PAM, S.p.A. v. United States,
582 F.3d 1336 (Fed. Cir. 2009)....................8

Pesquera Mares Australes Ltda. v. United States,
266 F.3d 1372 (Fed. Cir. 2001)....................13

Saha Thai Steel Pipe Co. v. United States,
879 F. Supp. 1331 (Fed. Cir. 1995) ....................15

SeAH Steel Corp. v. United States,
704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) ....................22

Shandong Huarong Machinery Co. v. United States,
29 C.I.T. 484 (2005) ....................18

Thomas Jefferson Univ. v. Shalala,
512 U.S. 504 (1994)....................22

Tianjin Wanhua Co. v. United States,
179 F. Supp. 3d 1062 (Ct. Int'l Trade 2016) ....................9

Torrington Co. v. United States,
156 F.3d 1361 (1998)....................22

United States v. L.A. Tucker Truck Lines,
344 U.S. 33 (1952)....................16

Universal Camera Corp. v. N.L.R.B.,
340 U.S. 474 (1951)....................8

Ventura Coastal, LLC v. United States,
736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) ....................16

Viraj Forgings, Ltd. v. United States,
283 F. Supp. 2d 1335 (Ct. Int'l Trade 2003) ....................12

Viraj Group, Ltd. v. United States,
343 F.3d 1371 (Fed. Cir. 2003)....................29

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i)....................8

19 U.S.C. § 1673....................10

19 U.S.C. § 1677b(a)(1)(B) ....................10

19 U.S.C. § 1677b(a)(1)(B)(i)....................10

19 U.S.C. § 1677b(a)(1)(B)(ii) ....................11, 15

19 U.S.C. § 1677b(a)(1)(C) ....................2, 11

19 U.S.C. § 1677b(f)(2) ....................24, 25

19 U.S.C. § 1677b(f)(3) ....................3, 23, 24

19 C.F.R. § 351.401(i) ....................3, 28

19 C.F.R. § 351.404(e).................... *passim*

19 C.F.R. § 351.404(e)(1)....................16, 17

19 C.F.R. § 351.407....................8

19 C.F.R. § 351.407(b) ....................3, 23, 24, 27

**Legislative Decisions**

Statement of Administrative Action, H.R. Doc. No. 103-826, vol.1 (1994),
reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA") ....................11

**Administrative Determinations**

Antidumping Duties; Countervailing Duties: Final Rule,
62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ("Final Rule") ....................11, 12

Certain Cold-Rolled Steel Flat Products from Brazil:
Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 49,946
(Dep't Commerce July 29, 2016), and accompanying Issues and Decision
Memorandum (July 20, 2016).................... 24-25

Certain Frozen Warmwater Shrimp from Ecuador: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,070 (Dep't Commerce Sept. 12, 2007), and accompanying Issues and Decision Memorandum at (Sept. 5, 2007) ....12

Certain Frozen Warmwater Shrimp From India: Preliminary Results of Antidumping Duty Administrative Review; 2016-2017, 83 Fed. Reg. 10,665 (Dep't Commerce Mar. 12, 2018) ....17

Certain Preserved Mushrooms From Poland: Final Affirmative Determination of Sales at Less Than Fair Value, 88 Fed. Reg. 18,118 (Dep't Commerce Mar. 27, 2023), and accompanying Preliminary Decision Memorandum (Mar. 5, 2018), unchanged in 83 Fed. Reg. 32,835 (July 16, 2018)....12, 17

Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 15,971 (Dep't Commerce Mar. 6, 2024), and accompanying Preliminary Decision Memo, unchanged in 89 Fed. Reg. 46,365 (May 29, 2024) ....28

Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders; 86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (the "Order") ....4

Common Alloy Aluminum Sheet From the Kingdom of Bahrain: Final Results of Antidumping Duty Administrative Review; 2023-2024, 91 Fed. Reg. 7,250 (Dep't Commerce Feb. 17, 2026), ("Final Results"), and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Common Alloy Aluminum Sheet from the Kingdom of Bahrain; 2023-2024 (Feb. 10. 2026) ("Final IDM") .... *passim*

Common Alloy Aluminum Sheet From the Kingdom of Bahrain: Preliminary Results of Antidumping Duty Administrative Review; 2023-2024, 90 Fed. Reg. 37,840 (Dep't Commerce Aug. 6, 2025), and accompanying Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review of Common Alloy Aluminum Sheet from the Kingdom of Bahrain; 2023-2024 (Aug. 1, 2025) ("PDM")....6, 15

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 89 Fed. Reg. 49,844 (Dep't Commerce June 12, 2024) ....4

Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy, 72 Fed. Reg. 7,011 (Feb. 14, 2007), and accompanying Issues and Decision Memorandum (Feb. 5, 2007) ....15

Prestressed Concrete Steel Wire Strand From Spain: Preliminary Results of Antidumping Duty Administrative Review; 2024-2025, 91 Fed. Reg. 37,074 (Dep't Commerce June 22, 2026), and accompanying Preliminary Decision Memo (June 16, 2026) unchanged in 91 Fed. Reg. 67,299 (Oct. 26, 2026) ....................28

Stainless Steel Bar From India: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 15,812 (Dep't Commerce Mar. 5, 2024), and accompanying Preliminary Decision Memo (Feb. 28, 2024), unchanged in 89 Fed. Reg. 73,367 (Sept. 10, 2024)....................28

This response brief is filed on behalf of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc. (collectively, "Defendant-Intervenors" or "Petitioners"), in opposition to the Rule 56.2 Motion for Judgment on the Agency Record and Memorandum of Law in Support thereof filed on behalf of Gulf Aluminium Rolling Mill B.S.C. (C) ("Plaintiff" or "GARMCO") (Aug. 4, 2026) (ECF Nos. 30-31) (hereinafter, "Plaintiff's Br."). As set forth below, Defendant-Intervenors urge this Court to reject Plaintiff's claims and to sustain the underling agency determination in its entirety.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

The administrative determination at issue is the final results of the annual administrative review of the antidumping duty order on common alloy aluminum sheet ("CAAS") from the Kingdom of Bahrain ("Bahrain") for the period April 1, 2023 through March 31, 2024, issued by the U.S. Department of Commerce ("Commerce" or the "Department"). See Common Alloy Aluminum Sheet From the Kingdom of Bahrain: Final Results of Antidumping Duty Administrative Review; 2023-2024, 91 Fed. Reg. 7,250 (Dep't Commerce Feb. 17, 2026) (hereinafter "Final Results") (P.R. 11),[1] and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Common Alloy Aluminum Sheet from the Kingdom of Bahrain; 2023-2024 (Feb. 10. 2026) (hereinafter "Final IDM") (P.R. 12);

[1] Documents in the administrative record are cited using the Public Record ("P.R.") or Confidential Record ("C.R.") number corresponding to the record documents identified in the Index to the Administrative Record filed with this Court on April 28, 2026 (ECF No. 25).

see also Memorandum entitled Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Final Analysis Memorandum (Feb. 10, 2026) ("Final Analysis Memo") (P.R. 10, C.R. 4).

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

**1. Was Commerce's selection of the United Arab Emirates, instead of Saudi Arabia, as the third-country comparison market supported by substantial evidence and in accordance with law?**

Yes. Commerce's selection of the United Arab Emirates ("UAE"), and not Saudi Arabia, as the third country comparison market is consistent with the statute and regulations and is supported by substantial evidence. Pursuant to 19 U.S.C. § 1677b(a)(1)(C), Commerce may use a third-country comparison market to establish normal value when the applicable statutory requirements are met. When there is more than one viable third-country market, Commerce's regulations (19 C.F.R. § 351.404(e)) direct the agency to consider product similarity, sales volume, and other appropriate factors in selecting among potential comparison markets. Commerce considers all three criteria and only gives priority to the largest third-country market by volume "if all other factors are equal." Although GARMCO sold a greater volume of CAAS in Saudi Arabia than in the UAE, Commerce properly evaluated all the relevant data and concluded that the UAE offered superior sales data for purposes of determining normal value. Specifically, the record demonstrated that GARMCO's sales to the UAE had the highest percentage of sales with similarity to GARMCO's U.S. sales and the largest number of unique products that were identical matches to products sold by GARMCO to the United States during the period of review. Because Commerce properly analyzed the data before it and reasonably determined that the factors were not equal, the agency was not required to select Saudi Arabia as the comparison market based on sales volume alone. Accordingly, Commerce's selection of the UAE – which was consistent with

all applicable regulatory criteria – should be affirmed as supported by substantial evidence and in accordance with law.

**2. <u>Was Commerce's application of the major input rule supported by substantial evidence and in accordance with law?</u>**

Yes. Commerce's application of the major input rule and its subsequent cost adjustment under 19 U.S.C. § 1677b(f)(3) are fully supported by substantial evidence and consistent with applicable law. GARMCO's contention that Commerce must make a definitive, cost-based finding as a prerequisite to revaluing affiliated transactions misinterprets both the statutory "reasonable grounds to believe or suspect" threshold and the clear mandates of 19 C.F.R. § 351.407(b). To establish the necessary logical framework to trigger the major input rule, Commerce carefully examined GARMCO's major input purchases alongside its affiliate's sales of the same input to unaffiliated parties. Furthermore, Commerce properly relied on GARMCO's own product-specific sales data to construct a reasonable, non-adverse, arm's-length market benchmark. Because GARMCO failed to demonstrate that its affiliate's sales to unaffiliated customers occurred outside the market under consideration, or that the inputs sold were non-comparable, Commerce's application of the major input rule was reasonable, lawful, and supported by the record.

**3. <u>Was Commerce's decision to select the earlier of the shipment date or invoice date as the date of sale supported by substantial evidence and in accordance with law?</u>**

Yes. Commerce's determination to utilize the earlier of the shipment date or invoice date as the date of sale is supported by substantial evidence and in accordance with law. Under 19 C.F.R. § 351.401(i), the invoice date serves as the presumptive date of sale unless an alternative date better reflects when the material terms of sale are locked in. Long-standing agency and judicial precedent dictate that when shipment occurs prior to the invoice date, the shipment date

establishes the finalized terms. To overcome this regulatory presumption, GARMCO bore a heavy evidentiary burden to conclusively demonstrate that all material terms were firmly and finally fixed at its preferred alternative contract date. GARMCO failed to meet this burden for three primary reasons. First, GARMCO acknowledged that shipping delays occurred due allegedly to COVID-19 disruptions. Because shipment delivery is an intrinsic material term of sale, these delays demonstrate that the material terms were fluid, not settled, on the contract date. Commerce properly rejected GARMCO's unsupportable assertion of a *force majeure* exception, noting that contractual changes due to external events indicate a contractual amendment or revision that demonstrate that the material terms of sale remained subject to change. Second, GARMCO's own submitted sales traces failed to establish that the material terms of its sales were fixed prior to the shipment or invoice date. Third, Commerce found that GARMCO's comparison market and U.S. sales traces did not have contracts for the reported sales. Because GARMCO failed to provide any contradictory evidence, Commerce's determination should be sustained.

## STATEMENT OF FACTS

On April 27, 2021, Commerce published the antidumping duty (AD) order on CAAS from Bahrain. See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders; 86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (the "Order"). On June 12, 2024, Commerce initiated an administrative review of the Order for the period of review ("POR") April 1, 2023 through March 31, 2024. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 89 Fed. Reg. 49,844, 49,846 (Dep't Commerce June 12, 2024) (P.R. 123). GARMCO was the sole respondent subject to review. See id.

Between July 2024 and July 2025, GARMCO provided timely responses to Commerce's initial and supplemental questionnaires.[2] In its response to Commerce's initial Section A questionnaire, GARMCO reported that its home market sales were "less than 5% of the volume of U.S. sales" and, therefore, reported the quantity and value of its sales to its "three largest third country markets." GARMCO's AQR at 3 (P.R. 109, C.R.125), see also id. at Exhibit A-1. In reporting its third country sales, GARMCO stated that "{s}ales to third countries (Saudi Arabia United Arab Emirates and Poland) are similar in product range (alloy 1xxx, alloy 3xxx, alloy 5xxx), channels of distribution (delivered to customer warehouse), and overall duty structure," but it did not provide the details necessary to evaluate the appropriateness of each third-country market as a comparison market. Id. at 4. Commerce subsequently issued a supplemental questionnaire and instructed GARMCO to provide a revised quantity and value chart for third country markets that included the number of sales, as well as information on the total quantity and value of its sales by alloy grade. See GARMCO's SQR1 at Exhibit SA-1 (P.R. 79, C.R. 85); and GARMCO's Revised Exhibit SA-1 Removing Certain BPI Designations (P.R. 78, C.R. 84).

On October 16, 2024, Commerce selected the UAE as the third-country comparison market. See Memorandum from Christopher Williams, International Trade Compliance Analyst,

---

[2] See Letters from Baker & McKenzie LLP to Sec'y of Commerce, "GARMCO's Section A Response (July 22, 2024) ("GARMCO's AQR") (P.R. 97-109, C.R. 102-125); "GARMCO's Sections B & C Response," (Aug. 19, 2024) (P.R. 87, C.R. 96-100); "GARMCO's Section D Response," (Sept. 3, 2024) (P.R. 83, C.R. 87-94); "GARMCO's First Supplemental Questionnaire Response," (Sept. 25, 2024) ("GARMCO's SQR1") (P.R. 79, C.R. 85); "GARMCO's Revised Exhibit SA-1 Removing Certain BPI Designations" (Oct. 9, 2024) ("GARMCO's Revised Exhibit SA-1") (P.R. 78, C.R. 84); "GARMCO's Section B Response (UAE)," (Nov. 15, 2024) (P.R. 74, C.R. 79-82); "GARMCO's Second Supplemental Questionnaire Response," (Feb. 11, 2025) ("GARMCO's SQR2") (P.R. 62, C.R. 41-74); "GARMCO's Third Supplemental Questionnaire Response," (Apr. 24, 2025) (P.R. 54, C.R. 34-39); "GARMCO's Fourth and Fifth Supplemental Questionnaire Response," (June 18, 2025) (P.R. 44, C.R. 19-31); and "GARMCO's Sixth Supplemental Questionnaire Response," (July 15, 2025) (P.R. 39, C.R. 15-17).

Office I, Antidumping and Countervailing Duty Operations to Alex Villanueva, Senior Director, Office I, Antidumping and Countervailing Duty Operations Re: Selection of an Appropriate Third Country Market (Oct. 16, 2024) ("Third Country Selection Memo") (P.R. 77, C.R. 83). Although GARMCO's sales to Saudi Arabia during the POR were greater by volume than its sales to the UAE, Commerce found that the UAE was a more appropriate comparison market because GARMCO's sales in the UAE were not only significant, but the country also provided the largest number of unique product matches to GARMCO's sales of CAAS in the United States during the POR. See id. at 3-4.

On August 6, 2025, Commerce's preliminary results of review were published in the Federal Register. See Common Alloy Aluminum Sheet From the Kingdom of Bahrain: Preliminary Results of Antidumping Duty Administrative Review; 2023-2024, 90 Fed. Reg. 37,840 (Dep't Commerce Aug. 6, 2025) ("Preliminary Results") (P.R. 34), and accompanying Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review of Common Alloy Aluminum Sheet from the Kingdom of Bahrain; 2023-2024 (Aug. 1, 2025) ("PDM") (P.R. 35), as well as the Memorandum entitled Common Alloy Aluminum Sheet from the Kingdom of Bahrain: Preliminary Analysis Memorandum (Aug. 1, 2025) ("Prelim Analysis Memo") (P.R. 30, C.R. 12).

Consistent with its Third Country Selection Memo, Commerce relied on the UAE as the third country comparison market for determining normal value. See PDM at 8 (P.R. 35). Commerce preliminarily applied the major input rule to GARMCO's purchases of certain inputs from its affiliated supplier. See id. at 10. Consistent with its established practice, Commerce relied on the earlier of GARMCO's shipment date or invoice date as the date of sale for its comparison market and U.S. sales. See id. at 7. Commerce preliminarily found that the contract date was not

the appropriate date of sale because GARMCO failed to satisfy the delivery obligations for certain contracted sales. As such, Commerce determined that contract date did not represent the point at which GARMCO and its customers in the UAE finalized the material terms of sale. See id.

On September 3, 2025, GARMCO submitted its administrative case brief to Commerce arguing that the agency (1) should select Saudi Arabia as the third country comparison market; (2) erred in its application of the major input rule; and (3) should have relied on the contract date as the date of sale. See generally Letter from Baker & McKenzie LLP to the Hon. Howard Lutnick, 2023-2024 Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet: GARMCO's Case Brief (Sept. 3, 2025) ("GARMCO Case Br.") (P.R. 23, C.R. 7). On the same day, Petitioners filed a letter in lieu of an affirmative case brief on a separate issue. See Petitioners' Letter in Lieu of Affirmative Case Brief (Sept. 3, 2025) (P.R. 22, C.R. 6). On September 15, 2025, Petitioners submitted their rebuttal case brief arguing that Commerce should (1) continue to rely on the UAE as the third country comparison market; (2) affirm its major input adjustment calculation; and (3) continue to use the invoice date as the date of sale. See Petitioners' Rebuttal Case Brief (Sept. 15, 2025) ("Pet. Rebuttal Br.") (P.R. 19, C.R. 5).

On February 17, 2026, Commerce published its Final Results, along with the related Final IDM and Final Analysis Memo. In the Final Results, Commerce rejected GARMCO's argument that Saudi Arabia was a more appropriate comparison market than the UAE. In particular, Commerce found that the UAE was the better comparison market because it had "the greatest percentage of number of sales with similarity to GARMCO's U.S. sales and the largest number of unique products that are identical matches to products sold by GARMCO to the United States during the POR." Final IDM at 5 (P.R. 12). Commerce continued to find its application of the major input rule under 19 C.F.R. § 351.407 to be "reasonable and non-adverse" because it used

the reported unaffiliated sales information that GARMCO itself provided to determine the value of the major input. Id. at 7. Finally, Commerce continued to use the earlier of GARMCO's shipment date or invoice date – rather than the contract date – as the date of sale for both third-country comparison market and U.S. sales. Commerce maintained this approach because it found that the material terms of sale were not finalized as of the contract date. See Final IDM at 11 (P.R. 12); Final Analysis Memo at 4 (P.R. 10, C.R. 4).

## STANDARD OF REVIEW

This Court will sustain the Final Results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009); see also Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938) ("Consolidated Edison Co."). To satisfy the standard of review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). In reviewing agency determinations, this Court will evaluate whether the agency action is reasonable given the record as a whole and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951); see also Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

This is a limited standard of review that only tests whether a determination is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co., 305 U.S. at 229. The applicable standard of review does not allow a

court to substitute its judgment for that of Commerce (see Akzo N.V. v. USITC, 808 F.2d 1471, 1487 (Fed. Cir. 1986) (citing Citizens to Preserve Overton Park, 401 U.S. 402, 416 (1971)), nor does it allow the parties to retry factual issues before a court de novo (see Kearns v. Chrysler Corp., 32 F.3d 1541, 1548 (Fed. Cir. 1994)). An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence. See, e.g., Consolo. v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Plaintiff is required to demonstrate that its preferred evidentiary finding is the only reasonable outcome on the administrative record, "not simply that {the preferred finding} may have constituted another possible reasonable choice." Tianjin Wanhua Co. v. United States, 179 F. Supp. 3d 1062, 1071 (Ct. Int'l Trade 2016) (citing Globe Metallurgical, Inc. v. United States, 865 F. Supp. 2d 1269, 1276 (Ct. Int'l Trade 2012)); Carbon Activated Tianjin Co. v. United States, 633 F. Supp. 3d 1329, 1335 (Ct. Int'l Trade 2023) ("Consistent with the court's standard of review and the discretionary, fact-specific nature of Commerce's determination the role of the court is not to determine 'whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'") (quoting Jiaxing Brother Fastener Co. v. United States, 822 F.3d 1289, 1300-01 (Fed. Cir. 2016)), 2025 U.S. App. LEXIS 11229, at *10-11 (Fed. Cir., May 9, 2025).

## ARGUMENT

### I. COMMERCE'S SELECTION OF THE UAE AS THE THIRD-COUNTRY COMPARISON MARKET IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

Plaintiff impermissibly urges this Court to reweigh record evidence that Commerce has already reasonably evaluated in selecting the UAE as the third-country comparison market. See Plaintiff's Br. at 12-19. Plaintiff argues that Commerce unlawfully selected the UAE because

Saudi Arabia "was the largest viable third-country market," providing "substantially greater sales volume, and substantially more matching sales, and a stronger overall basis for comparison to GARMCO's U.S. sales." Id. at 13. For the reasons explained below, as well as in Defendant's Response Brief, this Court should reject Plaintiff's disagreements with how Commerce weighed the record evidence. Because Commerce's selection of the UAE as the third-country comparison market is consistent with its practice, supported by substantial evidence, and otherwise in accordance with law, Commerce's determination should be sustained.

**A. Legal Framework**

Commerce determines whether merchandise is being, or is likely to be, sold in the United States at less than fair value by conducting product-specific comparisons between the merchandise's normal value and its U.S. sales price. See 19 U.S.C. § 1673. To establish normal value, Commerce follows a statutory hierarchy based on market viability. See 19 U.S.C. § 1677b(a)(1)(B). Under 19 U.S.C. § 1677b(a)(1)(B)(i), normal value is based primarily on the "price at which the foreign like product is sold in the exporting country" (i.e., the home market). Commerce, however, may deviate from this statutory preference and base normal value on sales to a third-country market if the foreign like product is not sold in the exporting country or if the aggregate quantity (or value) of home market sales is "less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States." Id. § 1677b(a)(1)(C).

When a respondent's home market is not viable, Commerce will establish normal value based on prices in a third-country market if: (1) the prices in that market are representative; (2) the aggregate quantity (or, if quantity is not appropriate, value) of sales in the third country market is five percent or more of the aggregate quantity (or value) of U.S. sales; and (3) no "particular market situation" exists that would prevent appropriate comparisons with U.S. prices. See 19 U.S.C.

§ 1677b(a)(1)(B)(ii). Although the statute establishes "representativeness" as a mandatory pre-requisite for selecting a third-country market, neither the statute nor Commerce's regulations define this term. See Alloy Piping Prods. v. United States, 201 F. Supp. 2d 1267, 1277 (Ct. Int'l Trade 2002), aff'd on other grounds, 334 F.3d 1284 (Fed. Cir. 2003). Nonetheless, it is well established that "where the aggregate quantity of third country sales {is} at a sufficient level, those sales are presumptively representative unless demonstrated otherwise." Husteel Co. v. United States, 520 F. Supp. 3d 1296, 1304 (Ct. Int'l Trade 2021) (citing 19 C.F.R. § 351.404(b)-(c)); see also Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,357 (Dep't Commerce May 19, 1997) ("Final Rule"); Statement of Administrative Action, H.R. Doc. No. 103-826, vol.1, at 821 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4162; and Husteel Co. v. United States, 558 F. Supp. 2d 1357, 1363-66 (Ct. Int'l Trade 2008) (instructing Commerce to find respondents' sales representative if the agency cannot present persuasive evidence demonstrating otherwise).

If more than one third country satisfies the baseline statutory criteria under 19 U.S.C. § 1677b(a)(1)(B)(ii), Commerce selects a third-country market by evaluating (1) whether the foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries; (2) whether the volume of sales to a particular third country is larger than the volume of sales to other third countries; and (3) such other factors as the Secretary considers appropriate. See 19 C.F.R. § 351.404(e). Commerce's "practice is to consider all three criteria" under 19 C.F.R. § 351.404(e) "when determining the appropriateness of a third-country comparison market," and only "if all other factors are equal" will Commerce "select the largest third-country market by volume." Final IDM at 4-5 (P.R. 12); see also Giorgio Foods, Inc. v. United States, Ct. No.

23-00133, Slip Op. 24-79 at 7-8, 2024 Ct. Intl. Trade LEXIS 84, at *5 (Ct. Int'l Trade July 17, 2024) ("Giorgio Foods"); and Certain Frozen Warmwater Shrimp from Ecuador: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,070 (Dep't Commerce Sept. 12, 2007), and accompanying Issues and Decision Memorandum at 11 (Sept. 5, 2007) ("The Department's regulations do not indicate that one factor is to be given more weight in the Department's analysis than any other factors . . . Rather, . . . the Department's practice is to consider all of the criteria in 19 CFR 351.404(e) together when determining the appropriateness of the third-country comparison market.").

Furthermore, both regulatory guidance and judicial precedent confirm that "not all of the three criteria need be present in order to justify the selection of a particular market," and "no single criterion is dispositive." Final Rule, 62 Fed. Reg. at 27,358; see also Giorgio Foods, Slip Op. 24-79 at 4 n.2, 2024 Ct. Intl. Trade LEXIS 84, at *3 n.2; Viraj Forgings, Ltd. v. United States, 283 F. Supp. 2d 1335, 1344-45 (Ct. Int'l Trade 2003) ("Viraj Forgings"). Moreover, "it is Commerce's discretion as to what is most appropriate in evaluating a comparison market." Certain Preserved Mushrooms From Poland: Final Affirmative Determination of Sales at Less Than Fair Value, 88 Fed. Reg. 18,118 (Dep't Commerce Mar. 27, 2023), and accompanying Issues and Decision Memorandum at 43 (Mar. 20, 2023). Consequently, Commerce is under no statutory obligation to designate a third-country comparison market based solely on volume or size. Giorgio Foods, Slip Op. 24-79 at 4 n.2, 2024 Ct. Intl. Trade LEXIS 84, at *3 n.2 ("Commerce is not required to choose the appropriate comparison market *solely* because the goods are identical, any more than it is required to choose the appropriate comparison market *solely* because the market is the largest available.") (citing Viraj Forgings, 283 F. Supp. at 1344-45 (emphasis in original)). Rather, the agency's primary mandate is to identify the appropriate "foreign like products" to achieve a true

"apples-to-apples" comparison, thereby fulfilling the overarching statutory requirement of a fair comparison between normal value and the U.S. price. See id. at 1340, 1347; Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1375 (Fed. Cir. 2001).

**B. Commerce Properly Prioritized Product Similarity in Selecting the UAE Over Saudi Arabia as the Third-Country Comparison Market**

In this case, Commerce properly exercised its broad discretion by prioritizing product similarity over total sales volume to select the UAE as the appropriate third-country comparison market. GARMCO argues that Saudi Arabia should have been selected because (1) it was the largest third-country market, accounting for **[ ]** percent of GARMCO's U.S. sales volume during the POR, compared to **[ ]** percent for the UAE, and (2) it had a greater total number of sales **[ ]** See Plaintiff's Br. at 14-15. Commerce, however, explained that although Saudi Arabia represented the largest third-country market by volume, GARMCO's sales to the UAE were "also significant" and yielded vastly superior data quality. See Final IDM at 5. Specifically, Commerce noted that the UAE market possessed: (1) "the greatest percentage of number of sales with similarity to GARMCO's U.S. sales;" and (2) "the largest number of unique products that are identical matches to products sold by GARMCO to the United States" during the POR. Id.

Substantial record evidence corroborates Commerce's determination. For example, **[ ]** sales transaction to the UAE, accounting for **[ ]** percent of GARMCO's sales, had a matching alloy to its U.S. sales, whereas **[ ]** sales transactions to Saudi Arabia, accounting for only **[ ]** percent of sales shared a matching alloy. See Third Country Selection Memo at 4 and Attachment (P.R. 77, C.R. 83). Furthermore, Commerce found that the UAE had the largest number of unique products matching GARMCO's U.S. sales during the POR – **[ ]**–

compared to only **[** **]** for Saudi Arabia. See id. Because the record demonstrates that the "quality of sales data between the UAE and Saudi Arabia {is} not equal," Commerce was not required to prioritize Saudi Arabia's greater sales volume over compelling information demonstrating product similarity between GARMCO's sales in the UAE and the United States. Final IDM at 5 ("Commerce will only give priority to the largest third-country market by volume "*{i}f all other factors are equal*") (emphasis in original); see also Third Country Selection Memo at 3 (P.R. 77, C.R. 83); Giorgio Foods, Slip Op. 24-79 at 7-8, 2024 Ct. Intl. Trade LEXIS 84, at *5. Instead, the agency properly balanced the competing record evidence in accordance with 19 C.F.R. § 351.404(e), concluding that because the merchandise GARMCO sold in the UAE had a greater degree of product comparability, the UAE represented the most appropriate comparison market for completing its dumping calculations. See Final IDM at 5.

GARMCO's argument seeks to reduce Commerce's comparison market selection to a simple volume calculation, asserting that its greater Saudi Arabian sales volume and greater number of matching sales relative to the UAE make it the inherently "more robust and representative comparison market." Plaintiff's Br. at 15-19. GARMCO's volume-centric argument, however, mischaracterizes the law and Commerce's regulations. Under 19 U.S.C. § 1677b(a)(1)(B)(ii) and 19 C.F.R. § 351.404(e), selecting an appropriate comparison market requires a multi-factored balancing test. Absolute sales volume cannot distract an agency from its core duty to evaluate the physical and technical comparability of the merchandise. See Saha Thai Steel Pipe Co. v. United States, 879 F. Supp. 1331 (Fed. Cir. 1995) (holding that Commerce is not required to mechanically default to the largest volume market when doing so compromises the accuracy of product-matching comparisons).

Indeed, GARMCO's assertion ignores the fact that comparison market sales volume does not determine the utility of available product matches. For example, a single comparison market transaction can serve as the basis for normal value for any number of U.S. sales, provided it is a sufficiently close match. See, e.g., Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy, 72 Fed. Reg. 7,011 (Feb. 14, 2007), and accompanying Issues and Decision Memorandum at Comment 1 (Feb. 5, 2007) ("a single foreign market sale can potentially be matched to sales to the United States. . ."). Conversely, significant volumes of home market sales that are poor matches to U.S. sales will be disfavored for product comparisons regardless of their quantity. Because alloy is the first and most critical product characteristic in Commerce's product comparison hierarchy for the underlying review (see PDM at 6), Commerce correctly prioritized product similarity over raw sales volume by counting the number of distinct U.S. alloy types for which the potential third country market provides at least one counterpart. See Final IDM at 5. The absolute number of sales, the volume of sales in kilograms, or market share do not rebut that methodology and do not transform a market with fewer alloy matches to U.S. sales into the more comparable market. Commerce properly considered GARMCO's percentages of sales involving a matching alloy, as well as the number of products that had identical matches to GARMCO's U.S. sales. Ultimately, Commerce reasonably selected the UAE as the comparison market because the composition of GARMCO's POR-sales in the UAE "enhances the accuracy of matching more identical products between comparison market sales and the U.S. sales," allowing for a more accurate dumping margin calculation. Final IDM at 5.

GARMCO contends that the "percentages of sales" relied on by Commerce "do not accurately reflect, under 19 C.F.R. § 351.404(e)(1), whether the alloy types exported to the UAE

are more similar to the alloy types exported to the United States than the alloy types exported to Saudi Arabia." Plaintiff's Br. at 15-16. GARMCO claims that the percentages "merely show the proportion of alloy types sold to the third country (that match the alloy type sold to the U.S.) with respect to their own total sales, which is easily inflated by their number of sales or lack of sales." Id. As an initial matter, GARCO failed to exhaust its administrative remedies because it never raised this specific argument before Commerce. See GARMCO Case Br. at 5-7. Consequently, this Court should decline to review GARMCO's untimely argument. See United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37 (1952); see also Dorbest Ltd. v. United States, 604 F. 3d 1363, 1375 (Fed. Cir. 2010) (holding that failure to raise an issue in a case brief constituted failure to exhaust administrative remedies); Ventura Coastal, LLC v. United States, 736 F. Supp. 3d 1342, 1352-53 (Ct. Int'l Trade 2024) (declining to address issue not raised in respondent's case brief, finding that respondent failed to exhaust administrative remedies).

Even if this Court reaches the merits, GARMCO's "inflation" argument is unavailing. Commerce's reliance on the proportion of alloy types sold in each third country market that match the alloy types sold in the United States – calculated as a percentage of that country's total sales – is the most accurate metric for determining which third-country market offers the broader overlap with U.S. alloys. Moreover, even when evaluating third-country sales volume rather than the number of sales, the UAE still maintained a significantly higher percentage of volume matching GARMCO's U.S. sales volumes at **[ ]** percent, compared to only **[ ]** percent for Saudi Arabia. See Third Country Selection Memo at Attachment (P.R. 77, C.R. 83). Notably, this volume-based metric yields **[**

**]** See id.

Finally, contrary to GARMCO's arguments, Commerce did not depart from its regulatory framework or practice. Under 19 C.F.R. § 351.404(e)(1), Commerce is directed to select a third country market based on product similarity, market viability, and sales volume. Commerce's Final Results properly prioritized product matching accuracy over raw transaction volume, and its decision is consistent with long-standing agency practice. Commerce routinely prioritizes identifying the market with the highest degree of identical or highly comparable product matches to ensure an accurate dumping margin calculation and minimize complex adjustments. See, e.g., Certain Preserved Mushrooms From Poland: Final Affirmative Determination of Sales at Less Than Fair Value, 88 Fed. Reg. 18,118 (Dep't Commerce Mar. 27, 2023), and accompanying Issues and Decision Memorandum (Mar. 20, 2023) at 43 (finding Romania to be "the more appropriate comparison market because the range of products sold to Romania {is} the most similar to the range of products that {respondent} sold to the U.S. market during the POI"); Certain Frozen Warmwater Shrimp From India: Preliminary Results of Antidumping Duty Administrative Review; 2016-2017, 83 Fed. Reg. 10,665 (Dep't Commerce Mar. 12, 2018), and accompanying Preliminary Decision Memorandum (Mar. 5, 2018) at 12 (selecting Belgium and the United Kingdom as the comparison markets because the respondents' sales of the foreign like product "were the most similar to the subject merchandise and both were viable comparison markets"), unchanged in 83 Fed. Reg. 32,835 (July 16, 2018) (final results). For these reasons, Commerce's selection of the UAE over Saudi Arabia is grounded in a rational evaluation of the regulatory criteria, consistent with agency practice.

GARMCO's claim that Commerce departed from its practice of selecting the largest third-country market by volume is entirely without merit. First, GARMCO's argument rests on a flawed, unsubstantiated premise that "all other factors are equal." Plaintiff's Br. at 18. They were not.

Commerce explicitly stated that the UAE market offered a broader overlap with the alloys of products that GARMCO sold in the United States during the POR. Pursuant to 19 C.F.R. § 351.404(e), Commerce properly exercised its discretion to prioritize product similarity over absolute sales volume – a choice squarely within its regulatory authority. See Final IDM at 5. Second, GARMCO's reliance on the preliminary results of the subsequent 2024-25 administrative review to establish a binding agency "practice" is misplaced. See Plaintiff's Br. at 19-20. Commerce's preliminary results in a separate, subsequent segment that was based on a distinct administrative record has no binding effect or factual bearing on the underlying review at issue in this action. Because Commerce's preliminary results in the subsequent review were issued well after the final results in the administrative review at issue here, Commerce could not have explained a subsequent departure that was nonexistent at the time of the Final Results. Ultimately, it is a well-settled principle of trade law that each administrative review constitutes a separate segment of a proceeding governed strictly by its own distinct administrative record. See Shandong Huarong Machinery Co. v. United States, 29 C.I.T. 484, 491 (2005).

Furthermore, Commerce's selection of the UAE as the third-country comparison market is entirely consistent with its historical approach in this proceeding. While Saudi Arabia was also GARMCO's largest third-country market during the original less-than-fair-value investigation, Commerce ultimately selected Australia as the comparison market, based on its determination that GARMCO's sales to Australia were "also significant" relative to Saudi Arabia and because GARMCO's sales to Australia offered a "larger sales volume as well as the greatest number of sales with similarity to U.S. sales by alloy." Pet. Rebuttal Brief (Sept. 15, 2025) at 7 (P.R. 19, C.R. 5) (emphasis added); and Letter from Kelley Drye & Warren to Sec'y of Commerce Re: Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from

Bahrain: 2023-2024 – Petitioners' Comments on Comparison Market Reporting Failure in GARMCO's Section BC Questionnaire Response, at Attachment 1 (Aug. 27, 2024) (appending Commerce's third country selection memorandum from the original investigation) (P.R. 84, C.R. 95). For these reasons, Commerce's selection of the UAE as the third-country comparison market is supported by substantial evidence and otherwise in accordance with law.

### C. Commerce Reasonably Explained Why the UAE's Product Similarity Outweighed Saudi Arabia's Larger Sales Volume

GARMCO claims that Commerce erroneously "selected the UAE based on **[**

**]** that represented only a negligible share of U.S. sales" (i.e., **[**

**]** and failed to explain why this "marginal difference" outweighed Saudi Arabia's larger sales volume. Plaintiff's Br. at 13. As an initial matter, Commerce's selection of the UAE did not rely solely on the number of unique products that provided identical matches to GARMCO's U.S. sales. Rather, Commerce properly considered the fact that the UAE offered the highest percentage of identical and similar product matches overall. See Final IDM at 5. Indeed, Commerce thoroughly evaluated the relevant data and adequately explained its rationale:

> While GARMCO's sales of aluminum sheet to Saudi Arabia during the POR were greater in quantity than its sales to the UAE, GARMCO's sales to the UAE are also significant and that the UAE has the largest number of unique products matching GARMCO's sales to the United States during the POR, serving as the better comparison market. Therefore, the quality of sales data between the UAE and Saudi Arabia are not equal. Given that the UAE satisfies the five-percent viability test as a third-country comparison market with more superior sales data than Saudi Arabia, we find that the selection of the UAE as the third-country comparison market enhances the accuracy in matching more identical products between comparison market sales and the U.S. sales, and thus, the dumping margin.

Importantly, among the common **[** **]** alloys that GARMCO sold in the United States, Saudi Arabia and the UAE, the record shows that GARMCO's sales in the UAE had both a higher

number of sales and volume for **[ ]** than Saudi Arabia. See Third Country Selection Memo at Attachment. This evidence further demonstrates the UAE's broader overlap in sales with U.S. alloys relative to Saudi Arabia.

Nevertheless, GARMCO asserts that the **[ ]** represented "a negligible share of U.S. sales – accounting for only **[ ]** percent of total U.S. sales or **[ ]** percent of kgs sold. See Plaintiff's Br. at 13. GARMCO's argument lacks merit. As illustrated below, among the **[ ]** different alloy types GARMCO sold in the United States, **[ ]** accounted for a relatively small share of U.S. sales:

**[**

**]**

<u>See</u> Third Country Selection Memo at Attachment (P.R. 77, C.R. 83). In fact, [ ] alloys accounted for [ ] the total sales and total volume sold of GARMCO's sales in the United States. <u>See</u> <u>id.</u> Given these facts, GARMCO's claim that the [ ] reflects a "marginal difference" that should not have outweighed Saudia Arabia's larger sales universe is unavailing. Plaintiff's Br. at 17.

GARMCO also highlights the predominance of [ ] which accounted for more than [ ] percent of the total U.S. sales volume and avers that "to the extent that alloy type was a factor, Saudi Arabian sales were nearly identical to the UAE for alloy [ ]" Plaintiff's Br. at 17-18. This argument fails for two reasons. First, Commerce must match the full array of U.S. sales, not only the dominant alloy. Second, to the extent this alloy is deemed significant, the data directly refute GARMCO's characterization: GARMCO [ ] <u>See</u> Third Country Selection Memo at Attachment. This [ ] GARMCO's claim that "Saudi Arabia and the UAE were identical" with respect to this dominant alloy and further supports Commerce's finding that "all factors are not equal." <u>Id.</u>; Plaintiff's Br. at 17-18; <u>Final IDM</u> at 5.

Commerce possesses broad discretion to weigh the regulatory factors. <u>See</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretations of its own regulations. . . . The agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. . . .") (citations omitted); <u>Torrington Co. v. United States</u>, 156 F.3d 1361, 1363-64 (1998); <u>SeAH Steel Corp. v. United States</u>, 704 F. Supp. 2d 1353, 1376 (Ct. Int'l Trade 2010). Because its determination that the UAE offered the most representative and similar sales universe for comparison to GARMCO's

U.S. sales is reasonable, lawful, and supported by substantial record evidence, Commerce's selection should be sustained.

## II. COMMERCE'S APPLICATION OF THE MAJOR INPUT RULE IS LAWFUL AND SUPPORTED BY SUBSTANTIAL EVIDENCE

### A. Commerce Satisfied the Statutory Threshold in Invoking the Major Input Rule

GARMCO's contention that Commerce must make an affirmative, cost-based finding before invoking the major input rule is contrary to both the statute's plain language and Commerce's regulations. See Plaintiff's Br. at 20-22. GARMCO argues that Commerce's application of the major input rule is unsupported by the record and contrary to law because Commerce relied on a comparison of the input price GARMCO paid its affiliated supplier with the price the supplier charged unaffiliated parties, rather than making a cost-based finding. See id. at 20-25.

The major input provision in the statute provides:

> If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under {the transactions disregarded rule}.

19 U.S.C. § 1677b(f)(3).

The statute's plain language states that Commerce need only have "reasonable grounds to believe or suspect" that the transfer price of the major input was less than the affiliate's cost of production. Id.; see also Mannesmannrohren-Werke AG v. United States, 77 F. Supp. 2d 1302, 1311 (Ct. Int'l Trade 1999) ("Mannesmannrohren"). The statute does not require a definitive,

prerequisite finding that the transfer price at which GARMCO purchased the input from its affiliate was actually below the affiliate's cost of production. As such, GARMCO's argument conflates the threshold required to initiate the major input rule with the ultimate factual finding required to adjust the input's value.

Furthermore, GARMCO's assertion that Commerce improperly revalued the input without the "necessary prerequisite findings" misinterprets the agency's regulations. Plaintiff's Br. at 20, and 23. Specifically, under 19 C.F.R. § 351.407(b), once the "reasonable suspicion" threshold is satisfied, Commerce is mandated to "determine the value of a major input purchased from an affiliated person based on the higher of" three benchmarks:

> (1) The price paid by the exporter or producer to the affiliated person for the major input;
>
> (2) The amount usually reflected in sales of the major input in the market under consideration; or
>
> (3) The cost to the affiliated person of producing the major input.

See 19 C.F.R. § 351.407(b); see also Mannesmannrohren, 77 F. Supp. 2d at 1312 (holding that 19 U.S.C. § 1677b(f)(3), as well as the legislative history of the major input rule, support Commerce's decision to use the highest of transfer price, cost of production, or market value to value the major inputs that the producer purchased from the affiliated supplier).

Here, the record establishes that Commerce possessed reasonable grounds to suspect that the transfer price was below the cost of production. Specifically, Commerce examined the information provided by GARMCO concerning its major input purchases from its affiliated supplier – [ ] – as well as the affiliate's sales of the major input to unaffiliated parties. See Prelim. Analysis Memo at 3 and Attachment C (P.R. 30, C.R. 10, 12); see also Final Analysis Memo at 2 and Attachment B (P.R. 10, C.R. 3-4). This evidence showed that [

**]** See id. Because the **[**

**]** it gave Commerce the logical "reasonable grounds to suspect" that GARMCO's transfer price was artificially low and potentially below the actual cost of production. See id. Because Commerce satisfied the statutory threshold under 19 U.S.C. § 1677b(f)(3), the agency correctly proceeded to determine the value of the major input consistent with the transactions disregarded rule and 19 C.F.R. § 351.407(b), and then applied a necessary major input adjustment to GARMCO's reported cost of production.

**B. Commerce Lawfully Utilized GARMCO's Unaffiliated Sales Data in Applying the Major Input Rule**

GARMCO's contention that Commerce erred in its major input analysis misconstrues the operation of the antidumping statute. Under 19 U.S.C. § 1677b(f)(3), the statute expressly incorporates the valuation principles of the "transaction disregarded" rule outlined in paragraph (2) of the same section. See 19 U.S.C. § 1677b(f)(2)-(3). By explicitly cross-referencing paragraph (2), § 1677b(f)(3) authorizes Commerce to determine the market value of a major input supplied by an affiliated supplier using the benchmark established under the transactions disregarded rule. Section 1677b(f)(2) provides that Commerce may disregard a transaction between affiliated parties for an input if the transaction "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2). It is well-settled administrative practice, routinely affirmed by the courts, that data regarding sales to or from unaffiliated parties constitutes the primary, most reliable benchmark for establishing an objective, arm's-length market value when a respondent's own purchases of the input from unaffiliated suppliers is not available. See, e.g., Certain Cold-Rolled

Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 49,946 (Dep't Commerce July 29, 2016), and accompanying Issues and Decision Memorandum (July 20, 2016) at Comment 10 (lacking respondent's own purchases of the input from unaffiliated suppliers, "the Department looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, to any reasonable source for market value"); Husteel Co. v United States, 98 F. Supp. 3d 1315, 1358-59 (Ct. Int'l Trade 2015) (holding Commerce's explanation that using the supplier's sales to all of its unaffiliated customers would better demonstrate the price usually reflected in sales of the major input in the market under consideration was reasonable). Accordingly, Commerce acted well within its statutory authority by relying on the unaffiliated sales data on the record to establish the market value of the major input.

GARMCO, however, argues that Commerce did not have a basis for proceeding with the transactions disregarded rule because "the record did not contain evidence of a reliable market price for the same major inputs used to produce {the subject merchandise} in the market under consideration." Plaintiff's Br. at 23. In support of this argument GARMCO contends:

> The unaffiliated sales data on which Commerce relied were reported in response to Commerce's request for all of **[ ]** unaffiliated sales, without limitation by market or product. Those data **[ ]**; indeed, the **[ ]** show sales to markets outside Bahrain and sales of multiple products that do not establish comparability to the inputs at issue. {...} Commerce therefore lacked a record basis to find that GARMCO's affiliated purchase prices did not fairly reflect the amount usually reflected in sales of those inputs in Bahrain.

Plaintiff's Br. at 23-24. GARMCO's argument, however, is contradicted by the facts of record.

In determining the value of the major input, Commerce examined **[ ]** data that GARMCO itself placed on the record regarding **[ ]** sales of **[ ]**

to unaffiliated customers. See Prelim. Analysis Memo at Attachment C (P.R. 30, C.R. 10, 12); see also Final Analysis Memo at Attachment B (P.R. 10, C.R. 3-4). Those data show that [ ] sales to unaffiliated parties pertain specifically to [ ] that GARMCO purchased from its affiliated supplier. Compare Final Analysis Memo at Attachment B (P.R. 10, C.R. 4) with GARMCO's SQR 4/5 at Exhibit D-7 (Revised 2) (P.R. 44, C.R. 22).

GARMCO erroneously contends that its data [ ] Plaintiff's Br. at 24. As Commerce explained, however, "GARMCO did not indicate that there are certain types of the same inputs that can be used in the production of aluminum sheet and other types of the same inputs that cannot be used in the production of aluminum sheet." Final IDM at 7. Because GARMCO failed to provide "more detailed and segregated information to justify a more favorable input adjustment" despite having an opportunity to do so, Commerce treated the information GARMCO provided in its supplemental response as "complete." Id. at 8. Thus, based on GARMCO's own data, Commerce reasonably concluded that the inputs sold by [ ] to unaffiliated producers constituted the same major inputs that GARMCO purchased from [ ] for use in the manufacture of the subject merchandise. Id.

GARMCO's further contention that Commerce could not reasonably rely on [ ] input sales to unaffiliated customers to value the major inputs in the market under consideration, because the affiliate's sales data [ ] is without merit. See Plaintiff's Br. at 23-24. As an initial matter, GARMCO reported that [ ] unaffiliated customers. See Final Analysis Memo at 2. Although GARMCO alleged that [

] Commerce determined that the sales to those customers are "largely irrelevant" to the major input adjustment, because they either did not purchase [ ] See id. at 3. With respect to [ ] sales to all other unaffiliated customers, which account for [ ] unaffiliated sales of [ ] GARMCO did not allege [ ] See id.

Given these facts, GARMCO's claim that its affiliate's unaffiliated customers were allegedly located outside Bahrain are immaterial to the major input adjustment overall. Rather, Commerce reasonably relied on [ ] to unaffiliated customers, as reported by GARMCO, to determine the value of GARMCO's major input pursuant to 19 C.F.R. § 351.407(b). Commerce's application of the major input analysis is therefore supported by substantial evidence and otherwise in accordance with law.

## III. COMMERCE'S RELIANCE ON THE EARLIER OF THE SHIPMENT DATE OR INVOICE DATE AS THE DATE OF SALE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

GARMCO's contention that Commerce unlawfully relied on the earlier of the shipment date or the invoice date as the date of sale lacks any legal or factual basis and should be rejected. See Plaintiff's Br. at 26-29. In determining the date of sale for the subject merchandise in the Final Results, Commerce followed its well-established practice, which is explicitly grounded in its regulations. Specifically, Commerce's regulation provides that it "normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business." 19 C.F.R. § 351.401(i). While this regulatory framework grants Commerce the discretion to utilize an alternative date, it may do so only if it "is satisfied that a different date better reflects the date

on which the exporter or producer establishes the material terms of sale." Id.; see also Eregli Demir ve Celik Fabrikalari T.A.S. v. United States, 308 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2018) ("Eregli").

Commerce consistently applies this standard across its proceedings, relying on the invoice date as its default date of sale. See, e.g., Stainless Steel Bar From India: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 15,812 (Dep't Commerce Mar. 5, 2024), and accompanying Preliminary Decision Memo (Feb. 28, 2024) at 9 (relying on invoice date "in accordance with our regulation and practice"), unchanged in 89 Fed. Reg. 73,367 (Sept. 10, 2024) (final results); Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023, 89 Fed. Reg. 15,971 (Dep't Commerce Mar. 6, 2024), and accompanying Preliminary Decision Memo at 7 (same), unchanged in 89 Fed. Reg. 46,365 (May 29, 2024) (final results). Furthermore, as recognized by the Court, Commerce maintains a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are locked in. See Dong-A Steel Co. v. United States, 337 F. Supp. 3d 1356, 1363 (Ct. Int'l Trade 2018); see also Final IDM at 9; Prestressed Concrete Steel Wire Strand From Spain: Preliminary Results of Antidumping Duty Administrative Review; 2024-2025, 91 Fed. Reg. 37,074 (Dep't Commerce June 22, 2026), and accompanying Preliminary Decision Memo (June 16, 2026) at 4 (relying on the earlier of shipment or invoice date as the date of sale in accordance with Commerce's practice), unchanged in 91 Fed. Reg. 67,299 (Oct. 26, 2026) (final results).

The law is clear that the invoice date serves as the presumptive date of sale, thereby imposing a heavy evidentiary burden on any party seeking an exception. To overcome this

presumption, a party must conclusively demonstrate that the material terms of sale were both "firmly" and "finally" established on its proposed alternative date. See ArcelorMittal USA LLC v. United States, 302 F. Supp. 3d 1366, 1370 (Ct. Int'l Trade 2018) (citing Toscelik Profil Ve Sac Endüstrisi A.S. v. United States, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017)); Viraj Group, Ltd. v. United States, 343 F.3d 1371, 1377 n.1 (Fed. Cir. 2003) (citing 19 C.F.R § 351.401(1)). In other words, a plaintiff "must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its {date of sale} as the only reasonable outcome." Allied Tube and Conduit Corp. v. United States, 127 F. Supp. 2d 207, 220 (Ct. Int'l Trade 2000). Here, because GARMCO failed to point to any evidence within the record that contradicts Commerce's findings, it has failed to overcome the deference owed to the agency, and its challenge should be rejected.

Indeed, the record evidence does not show that the material terms of sale – price, quantity, delivery, and payment terms – were set on the contract date rather than the subsequent invoice or shipment dates as GARMCO claims. See Plaintiff's Br. at 28. GARMCO acknowledges that "changes to material contract terms" occurred for "a limited number of sales" (due to "COVID restrictions and impact") but contends that Commerce was still required to conduct a factual analysis to determine when those terms were finalized. Id. (citing Nucor Corp. v. United States, 612 F. Supp. 2d 1264, 1309 (Ct. Int'l Trade 2009)).

Further analysis, however, was unnecessary here. GARMCO itself reported that the contract date was a "contract delivery date" when delivery was "supposed to occur." Final IDM at 10. The date of shipment is a material term of sale. See Eregli, 308 F. Supp. 3d at 1307 ("The material terms generally include the terms of price, quantity, payment, and delivery."). If certain sales shipments were delayed beyond what was anticipated in the contract date, that simply means that the material terms had not been fixed. Indeed, as Commerce correctly explained, a "date on

which the delivery was 'supposed to occur' implies that the material terms of sale {are} not finalized at the contract date." Final IDM at 10. Because Commerce confirmed that certain deliveries were delayed well after the anticipated contract delivery date, it properly determined that "GARMCO's contract date is not the date on which GARMCO and its customers finalized the material terms of sale." Id.

GARMCO claims that "the only change Commerce relied upon was delayed delivery caused by COVID-related restrictions and disruptions," which it claims were circumstances "outside the parties' control," and that Commerce did not rely on any evidence that the material terms remained unsettled. Plaintiff's Br. at 29. This argument is unavailing. As Commerce correctly noted, neither the relevant regulations nor agency precedent provides a *force majeure* exception to the standard date-of-sale methodology. See Final IDM at 10. Rather, Commerce properly determined that "{a} change to the delivery term in the contract due to *force majeure* indicates a contractual amendment or revision, which demonstrates that the material terms of sale in the contract are subject to change for all reported sales." Id.

Furthermore, record evidence fails to demonstrate that the material terms of sale were finalized by any date prior to the shipment or invoice date. For example, GARMCO's self-selected sales trace, which purported to confirm that the material terms of sale were finalized at the contract date, showed that **[**

**]** See GARMCO's SQR2 at Exhibit SQ2-8 (pdf pages 94-97) (P.R. 62, C.R. 67); see also Final IDM at 11 and Final Analysis Memo at 4. GARMCO's additional sales traces similarly contained no evidence that the material terms were fixed at any point prior to the invoice date. See id at Exhibit SQ2-13 (P.R. 62, C.R. 51-53). Additionally, Commerce found that GARMCO's comparison market and U.S. sales traces do not have even contracts for the reported

sales. See Final IDM at 11. Despite having ample opportunity to provide the missing contracts for these sales traces, GARMCO failed to do so. See id. Consequently, because the record contains no evidence that other material terms of sale (e.g., quantity and price) were fixed on the contract date, GARMCO failed to meet the high burden of proof required to overcome Commerce's regulatory presumption and preference for relying on the invoice (or earlier of shipment date or invoice date) as the date of sale. Accordingly, GARMCO's argument fails as a matter of law and fact.

## IV. CONCLUSION

For all the reasons described above and in Defendant's response brief, Defendant-Intervenors respectfully request this Court to sustain the Commerce's Final Results in their entirety.

Respectfully submitted,

/s/ John M. Herrmann

JOHN HERRMANN
JOSHUA R. MOREY
GRACE W. KIM

Counsel to Defendant-Intervenors

Dated: October 27, 2026

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated May 29, 2026 (ECF No. 29), setting the word limitation of Defendant-Intervenors' Response Brief to 14,000 words, counsel for Defendant-Intervenors Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, JW Aluminum Company, Novelis Corporation and Texarkana Aluminum, Inc. certifies that this Response Brief contains 9,746 words, including footnotes, tables and charts. The word count certification is made in reliance on the word count feature contained in Microsoft 365 – Enterprise.

Respectfully submitted,

/s/ John M. Herrmann

JOHN M. HERRMANN
JOSHUA R. MOREY
GRACE W. KIM
KELLEY DRYE & WARREN LLP
670 Maine Avenue, SW, Suite 600
Washington, DC 20024
(202) 342-8400

Counsel to Defendant-Intervenors Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members

Dated: October 27, 2026